# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SOUTHERN UTAH DRAG STARS; <br><br> MITSKI AVALŌX, <br><br>                 Plaintiffs, <br><br>      v. <br><br> CITY OF ST. GEORGE; <br><br> CITY COUNCIL OF ST. GEORGE; <br><br> COUNCILMEMBER JIMMIE HUGHES, in his official capacity; <br><br> COUNCILMEMBER DANNIELLE LARKIN in her official capacity; <br><br> COUNCILMEMBER NATALIE LARSEN in her official capacity; <br><br> COUNCILMEMBER GREGG MCARTHUR in his official capacity; <br><br> COUNCILMEMBER MICHELLE TANNER in her official capacity; <br><br> MAYOR MICHELE RANDALL in her official capacity; <br><br> CITY MANAGER JOHN WILLIS in his official capacity, <br><br>                 Defendants. | Case No. |

## COMPLAINT

Plaintiffs Mitski Avalōx and Southern Utah Drag Stars, by and through their undersigned attorneys, bring this Complaint against Defendants the City of St. George, the City Council of St. George, Councilmembers Jimmie Hughes, Dannielle Larkin, Natalie Larsen, Gregg McArthur, and Michelle Tanner, Mayor Michele Randall, and City Manager John Willis, and in support thereof state the following:

### INTRODUCTION

1.      Plaintiffs Mitski Avalōx and Southern Utah Drag Stars ("Drag Stars") bring this action to remedy flagrant and ongoing violations of their free speech, due process, and equal protection rights.

2.      Plaintiffs sought a permit from the City of St. George, Utah (the "City") to host a drag performance event in a City-owned park.  The City denied Plaintiffs' application and took other discriminatory actions to prevent the drag performance from taking place based on the City's objection to the viewpoint and content of Plaintiffs' performance, including the gender-nonconforming expression it involves.

3.      Plaintiffs' planned drag performance was intended to celebrate and affirm their local LGBTQ+ community in the wake of recent anti-LGBTQ+ discrimination and violence.  Their vision was a public event where community members of any gender identity and sexual orientation were welcome to share in an expression of joy, belonging, and family fun.  Through the event, Drag Stars strove to promote acceptance, LGBTQ+ visibility, and unity within St. George.

4.      The City's denial of Plaintiffs' permit application was part of a campaign by City officials, including Councilmember Michelle Tanner, to suppress drag performances in the City.  That campaign is motivated by unfounded fears, prejudice, and moral disapproval of the LGBTQ+

community.  In particular, it has been catalyzed by the false conspiracy theory that LGBTQ+ individuals, and drag performers in particular, seek to "groom" children "in order to abuse them";[1] at least one city council member has outright accused drag performers who perform "for children" of "PREDATORY behavior."[2]  That same member has publicly advocated for ordinances outright banning drag performance from public spaces;[3] evidence obtained through public records requests suggests that the City Council is currently considering implementing such a ban.

5.    In denying Plaintiffs' permit application, the City invoked a City Code provision that had apparently never before been applied to deny a permit application, and imposed a six-month moratorium on new special event permits.  These actions were mere pretexts to mask the discriminatory intent behind the City's decision to deny Plaintiffs a permit.  Indeed, immediately after denying Plaintiffs' permit application, the City Council changed the City Code provision, and carved out an exception in the moratorium to give itself complete discretion to issue permits to events that it favors.

6.    The City's discriminatory denial of Plaintiffs' permit application resonates with decades of mistreatment towards a marginalized community.  It communicates to Plaintiffs, and to the broader LGBTQ+ community in St. George, that they are unwelcome and unworthy to exist in public spaces.  Further, the City's actions silence artistic expression in an effort to score political points under the mantle of being opposed to LGBTQ+ people's civil rights.

---

[1] *See What is "Grooming?" The Truth Behind the Dangerous, Bigoted Lie Targeting the LGBTQ+ Community*, Anti-Defamation League (Sept. 16, 2022), https://www.adl.org/resources/blog/what-grooming-truth-behind-dangerous-bigoted-lie-targeting-lgbtq-community.

[2]    Michelle    Tanner    (@michelletannerusa),    Instagram    (Apr.    12,    2022), https://www.instagram.com/p/Cq9PG9MtDsM/.

[3] *See infra* ¶ 45.

7.     Plaintiffs now bring this action to vindicate their rights to freedom of speech, due process, and equal protection, as citizens of equal dignity under the law.

## JURISDICTION AND VENUE

8.     This action arises under the United States Constitution, 42 U.S.C. § 1983, and this Court's equitable jurisdiction.

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

10.     This Court is authorized to issue a declaratory judgment and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1983; Rules 57 and 65 of the Federal Rules of Civil Procedure; and this Court's equitable jurisdiction to enjoin actions by state officials that violate the Constitution, *see Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326-27 (2015).

11.     This Court has personal jurisdiction over Defendant City of St. George, which is a municipality located and incorporated in the State of Utah, and Defendant City Council of St. George, which is the legislative body of that municipality. This Court has personal jurisdiction over the remaining Defendants, who are individuals residing in Utah and who are sued in their official capacities.

12.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1)(2) because Defendants reside in this district and because a substantial part of the events giving rise to the claims occurred in this district.

## THE PARTIES

13.     Plaintiff Mitski Avalōx lives in Utah.  She is a transgender woman and the CEO of Southern Utah Drag Stars.

14.     Plaintiff Southern Utah Drag Stars ("Drag Stars") is a limited liability company registered in Hurricane, Utah since November 1, 2022.  Drag Stars hosts LQBTQ+-affiliated events, including drag performances, across Southern Utah.  Its political and social mission is "Rebelling by Existing." Drag Stars aims to create a world where everyone, regardless of where they live, can feel proud of who they are and find a place where they belong.

15.     Defendant City of St. George is an incorporated city in the State of Utah and the county seat of Washington County, Utah.

16.     Defendant City Council of St. George is the governing body of St. George.

17.     Defendants Jimmie Hughes, Dannielle Larkin, Natalie Larsen, Gregg McArthur, and Michelle Tanner are the members of Defendant City Council of St. George, Utah, and are sued in their official capacities.

18.     Defendant Michele Randall is the Mayor of St. George, Utah, and is sued in her official capacity.

19.     Defendant John Willis is the City Manager of St. George, Utah, and is sued in his official capacity.

## FACTUAL ALLEGATIONS

## I.     Background on Drag Performance

20.     Drag is "entertainment in which performers caricature or challenge gender stereotypes (as by dressing in clothing that is stereotypical of another gender, by using

exaggeratedly gendered mannerisms, or by combining elements of stereotypically male and female dress) and often wear elaborate or outrageous costumes."[4]

21.     For nearly 100 years, drag has been specifically associated with the lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") community.

22.     Drag performance is an art form like other live theater.  It often includes singing, dancing, lip-syncing, and other components with entertainment value.  Drag performers also use hair and dress to communicate messages about gender stereotypes and gender roles, as well as community and LGBTQ+ identity.  Accordingly, "drag—for all its glamour and fantasy—[i]s a political act."[5]

23.     Drag performers commonly have LGBTQ+ identities, and commonly use drag to express a gender other than the performer's sex designated at birth. Drag performances also commonly cater to LGBTQ+ audiences.

24.     While many drag queens are cisgender men and many drag kings are cisgender women, drag performers are diverse and can have varied gender identities.  For example, cisgender women and transgender women may perform as drag queens as a way to embrace their gender identity as women.

25.     Drag can be a source of empowerment for LGBTQ+ individuals and allies. Through these shows, drag performers can challenge traditional gender norms and expectations. This can be important for LGBTQ+ individuals who may feel constrained or limited by societal

---

[4] *Drag,* Merriam-Webster, https://www.merriam-webster.com/dictionary/drag (last visited May 23, 2023).

[5] Craig Seligman, "You Don't Just Silence a Drag Queen," Time (Mar. 23, 2023), https://time.com/6265333/drag-queen-political-act/.

expectations and norms, because drag can create a space that allows them to assert their own identities authentically.

26.    Drag performances might involve singing, dancing, stand-up comedy, or any number of other artistic endeavors.  Drag performances are not inherently sexual in nature; is not unusual for drag performances intended for adult audiences to employ bawdy humor, but that is by no means a necessary ingredient.[6] Notably, the drag event for which Plaintiffs here sought a permit was designed to be family-friendly in an open public park and without any age-inappropriate, sexual, or bawdy content.

27.    "[P]recisely because they are entertaining," drag performances constitute an important form of political and social communication for the LGBTQ+ community, "illuminating challenging aspects of gay life for mainstream audiences and providing a space for the construction of collective identities that confront and rework gender and sexual boundaries."[7]

28.    Family-friendly drag shows provide a space for performances to be enjoyed by broader audiences, and can bring specific benefits to the community.  For example, it is well-established that LGBTQ+ youths face high risks of self-harm, including suicide, which is magnified when they do not feel supported within their communities.[8]  Drag can promote a

---

[6] *See* Jeff McMillan, *Analysis: Political Rhetoric, False Claims Obscure the History of Drag Performance*, PBS NewsHour (Oct. 30, 2022), https://www.pbs.org/newshour/politics/political-rhetoric-false-claims-obscure-the-history-of-drag-performance.

[7] Verta Taylor et al., *Performing Protest: Drag Shows As Tactical Repertoire of the Gay and Lesbian Movement*, 25 Research in Social Movements, Conflicts and Change 105, 108 (2004).

[8] *See, e.g.*, *Facts About LGBTQ Youth Suicide*, Trevor Project (Dec. 15, 2021), https://www.thetrevorproject.org/resources/article/facts-about-lgbtq-youth-suicide/;    Mark. L. Hatzenbuehler, *The Social Environment and Suicide Attempts in Lesbian, Gay, and Bisexual Youth*, 127 Pediatrics 896 (2011).

message of acceptance and affirmation for these young people, which can decrease that risk of self-harm.[9]

## II.     The City Discriminates Against Drag Performances

29.     Over the last ten months, the City has repeatedly taken action to stifle or ban drag performances in St. George.  City officials' particular focus on banning drag appears to stem from a widely-reported controversy in June 2022.

30.     In June 2022, the HBO program *We're Here* taped an episode in St. George.  In *We're Here*, three popular drag queens travel to small towns across America to speak with members of the local LGBTQ+ community and perform in drag shows.  For this episode, *We're Here* sought and obtained a permit to hold and film a drag show in one of the City's public parks.

31.     A contingent of St. George residents and certain City officials mobilized against the *We're Here* performance and sought to cancel the show's permit.  Several City Council members asked the City Attorney to investigate whether the council "would be able to do anything to stop the show," but were informed that HBO had followed all necessary procedures.[10]

32.     The efforts to cancel the show's permit were led by Councilmember Michelle Tanner, who has often been a vocal critic of the LGBTQ+ community in St. George.  For example, in the same month, Councilmember Tanner publicly criticized the St. George police department over an innocuous Facebook post stating "Happy Pride."  Tanner responded by writing, "Who's

---

[9]     *LGBTQ & Gender-Affirming Spaces*, Trevor Project (Dec. 3, 2020), https://www.thetrevorproject.org/research-briefs/lgbtq-gender-affirming-spaces/.

[10]   Elle Cabrera, *Emails, texts show St. George council scrambling ahead of drag show, Pride Month*, St. George Spectrum & Daily News (June 26, 2022), https://www.thespectrum.com/story/news/2022/06/26/emails-texts-show-st-george-council-scrambling-ahead-drag-show-pride-month/7703222001/.

running this social media page, and why are our tax dollars being spent to promote someone's sexuality?"[11]

33.     When news of the *We're Here* performance became public, Councilmember Tanner wrote an open letter to former City Manager Adam Lenhard criticizing his approval of HBO's permit, in part because the location chosen was allegedly near several "children's" areas such as a museum and a carousel.  Councilmember Tanner advocated revoking the permit as violating St. George City Code § 3-10-8(A)(2), on the basis that the performance was "not consistent with the intended nature and use of the requested City property."[12] Councilmember Tanner publicized this letter via her social media on June 3, 2022.  In a text message thread among the City Council, Tanner argued that there was no First Amendment issue around her position that drag should be performed only in private and for adult audiences, and that *We're Here*'s "whole strategy to get ratings is to purposefully stir controversy and convert drag queens in traditionally conservative towns."[13]

---

[11] *Drag show and Police Pride post divide St. George*, Q Salt Lake (June 23, 2022), https://www.qsaltlake.com/news/2022/06/23/drag-show-and-police-pride-post-divide-st-george/.

[12] Michelle    Tanner    (@michelletannerusa),    Instagram    (June   3,    2022), https://www.instagram.com/p/CeWlnkaphwq/.

[13] Elle Cabrera, *Emails, texts show St. George council scrambling ahead of drag show, Pride Month*, St.   George   Spectrum   &   Daily   News   (June   26,   2022), https://www.thespectrum.com/story/news/2022/06/26/emails-texts-show-st-george-council-scrambling-ahead-drag-show-pride-month/7703222001/; Ashley Imlay, *Texts highlight drag show debate that led to St. George city manager's resignation*, KSL.com (Nov. 1, 2022), https://www.ksl.com/article/50507507/texts-highlight-drag-show-debate-that-led-to-st-george-City-managers-resignation.

34.     Upon information and belief, on May 27, 2022, the City Council held a closed-door meeting at which it voted to order City Manager Lenhard to revoke and/or deny HBO's permits for the *We're Here* taping.

35.     However, the next day, St. George City Manager Lenhard advised the City Council that he would not follow that order, because *We're Here* had broadly complied with the legal requirements for an event permit, and if the City attempted to cancel the permit, it could expose itself to litigation.  The *We're Here* drag show therefore went ahead on June 3, 2022, and was filmed by HBO.  After the fact, Mayor Randall wrote in response to an email from a community member that the City "would have lost the lawsuit" if it had revoked HBO's permit, noting: "A public entity cannot discriminate against anyone renting our facilities based on content."[14]

36.     On or about July 14, 2022, the City Council informed City Manager Lenhard that he would be fired as a result of his refusal to deny or revoke the drag show permit.  Lenhard publicly resigned on or about October 3, 2022.  Shortly thereafter, the *Salt Lake Tribune* reported that Lenhard's resignation was in fact the result of "pressure from the St. George City Council over his handling of the permit for a drag show on City property on June 3."[15]  The *Tribune* later reported that Lenhard settled a threatened wrongful termination claim with the City for some $625,000.[16]  Councilmember Tanner was the lone vote against paying for the settlement.

---

[14] Bryan Schott & Mark Eddington, *St. George City manager resigned after pressure over drag show on public property.  He is leaving with a six-figure settlement.*, Salt Lake Trib. (Oct. 25, 2022), https://www.sltrib.com/news/politics/2022/10/25/st-george-City-manager-resigned/.

[15] *Id.*

[16] Bryan Schott, *Settlement for St. George City Manager Forced Out After Drag Show ill Cost Taxpayers $625,000*, Salt Lake Trib. (Oct. 27, 2022), https://www.sltrib.com/news/politics/2022/10/27/settlement-st-george-city/.

37.     The Defendants' efforts to ban drag performances recall decades of anti-LGBTQ+ discrimination and violence.  In recent years, more than one-third of hate crimes in Utah have targeted the LGBTQ+ community.[17] Since 2022, the LGBTQ+ community in Utah has braced against a wave of anti-trans legislation introduced and passed at the state level including laws that target access to medically-necessary healthcare, prevent transgender youth from equally participating in school sports, and limit ability to update gender information on birth certificates.[18] And in St. George, members of the LGBTQ+ community are on the receiving end of a barrage of threats to their physical safety.

## III.     Plaintiffs Create Southern Utah Drag Stars

38.     Drag Stars is a limited liability corporation that organizes drag performances.  Its sole employee and owner is Mitski Avalōx.

39.     Avalōx founded Drag Stars in November 2022 in the aftermath of the *We're Here* taping and controversy.  Drag Stars is the only organization that regularly hosts family-friendly drag performances in Washington County, Utah.

40.     Drag Stars was founded as a grassroots initiative to bring communities and local businesses together by facilitating inclusive drag shows.

41.     Drag Stars's mission is to empower and celebrate rural communities through the art of drag, creating spaces for self-expression and fostering inclusivity and diversity.  It aims to

---

[17] Paighten Harkins, *Hate Crimes Against Utah LGBTQ nearly doubled last year, with a big jump during Pride Month*, Salt Lake Trib. (May 31, 2022), https://www.sltrib.com/news/2022/05/31/hate-crimes-against-utah/.

[18] *See, e.g.,* HB 11 (2022); SB 16 (2023); SB 93 (2023); HB 209 (2023).

provide educational resources and support for individuals to explore and celebrate their identities, while highlighting the unique experiences and challenges faced by those living in rural areas.

42.     Drags Stars aims to create a world where everyone, regardless of where they live, can feel proud of who they are and find a place where they belong.

43.     For Avalōx, Drag Stars also has a political mission: to express to communities and government officials that people with gender presentations and identities that do not conform to majoritarian norms should be accepted, included, and supported.

**IV.     The City Continues Its Efforts to Ban Drag Shows from the Public Sphere**

44.     Some people in St. George have remained active against drag shows in the City following the controversy over the *We're Here* event, citing fears about immorality and "grooming."   For example, an October 19, 2022 drag show hosted by the LGBT Student Association at Utah Tech University, which is located in St. George, drew attacks from Councilmember Tanner, who reportedly called Utah Tech "Woke University."[19]

45.     Councilmember Tanner in particular has continued to stoke conflict over the issue of drag, including by favoring statewide legislation to restrict drag performances.   Tanner has publicly compared drag performers to "groups who claim children can become cats and men can have babies."[20]   She has accused drag performers who perform "for children" of "PREDATORY

---

[19] Mark Eddington, *'They Are Grooming Our Children for Immoral Satanic Worship': Southern Utah Politicians Target Drag Shows*, Salt Lake Trib. (Oct. 21, 2022), https://www.sltrib.com/news/politics/2022/10/21/they-are-grooming-our-children/.

[20] Michelle Tanner (@michelletannerusa), Instagram (Nov. 6, 2022), https://www.instagram.com/p/ChtUOsIt5M-/.

behavior."[21]  She has also advocated "implementing ordinances" to ban what she views as "lewd, vulgar, and adult content in our public spaces"—namely drag.[22]

46.     Late November 2022, Modern Farm and Artisan Co-Op (MoFACo) hosted an event which featured a Christmas drag photo booth that featured a cisgender woman dressed as Mrs. Claus and two cisgender men dressed as elves who wore heels, a wig, and make up.  These drag performers were organized through Plaintiff Drag Stars.

47.     In January 2023, Councilmember Tanner attempted to revoke City sponsorship for St. George's popular Downtown Farmers Market, which was owned by the owners of MoFACo, in response to hosting the Christmas photobooth.

48.     Councilmember Tanner explicitly stated that her objection to City support for the Farmer's Market was based on her view that the MoFACo drag photo booth "violate[d] community standards."[23]  In particular, she asserted that she opposes drag "when it involves children," *i.e.*, in all-ages locations.[24]

49.     In defense of her opposition to the City's provision of a fee waiver for the Downtown Farmers Market, Councilmember Tanner explained to a constituent that "[i]t is not a violation of Constitutional rights to recognize that one can't go yell 'fire' in a movie theater or

---

[21]   Michelle   Tanner   (@michelletannerusa),   Instagram   (Apr.   12,   2022), https://www.instagram.com/p/Cq9PG9MtDsM/.

[22]   Michelle   Tanner   (@michelletannerusa),   Instagram   (Oct.   3,   2022), https://www.instagram.com/p/CjQapT3u-LF/; *see* Michele Randall (@michelerandall), Instagram (Sept. 30, 2022),  https://www.instagram.com/p/CjJ2SjwLbTZ/ (statement from Mayor Randall opining that such an ordinance would be "potentially unconstitutional and discriminatory").

[23] Community Education Channel, *St. George City Council January 5, 2023*, YouTube, at 1:56:10 (Jan. 5, 2023), https://www.youtube.com/watch?v=2FAkHVZ54Hk.

[24] *Id.* at 1:56:50.

interact with children in a deviant way."  She also agreed with another constituent's complaint that drag artists "are taking advantage of taxpayer funds, to infiltrate our area, targeting the children."

**V.      Drag Stars Solicits a Permit for An Inclusive, Public Event in the Park**

50.      Drag Stars has hosted several well-attended events in St. George starting in December 2022.

51.      In February 2023, Drag Stars contacted the City of St. George to reserve Vernon Worthen Park, a City-owned park, for a drag event titled "Our Allies & Community Drag Show." The intended date for this event was April 28, 2023.  Drag Stars expected 500 or more attendees and several vendors.

52.      The event was intended to express support for and to strengthen the sense of community among LGBTQ+ persons in the area, and particularly to affirm their LGBTQ+ identities in the wake of the *We're Here* controversy.  It was also intended to support LGBTQ+ youth, whose options for supportive community spaces in St. George are limited.  Its content was designed to be entirely family-friendly as well, given that it was to be held in a public park.

53.      Tara Lipsyncki, a prominent drag artist from Salt Lake City,[25] was scheduled to host the event.  Mitski Avalōx would also have appeared in drag at the beginning of the event to welcome the audience and introduce Lipsyncki.

54.      The event would have included sets from several music artists, with drag performances from a number of artists interspersed in between.

---

[25] Josh Petersen, *Utah Drag Queens Embrace the Art of Female Impersonation,* Salt Lake Trib. (Sep. 10, 2021), https://www.saltlakemagazine.com/drag-utah-female-impersonation/.

55.    The City's Special Events Coordinator Sarah Reber informed Drag Stars on February 22, 2023, that Drag Stars had an unofficial "hold on Vernon Worthen."

56.    Drag Stars formally filed its application for a special event permit on March 3, 2023.

57.    Between March 9, 2023 and March 16, 2023, Avalōx corresponded extensively with Reber about the location for the show (which was moved from Vernon Worthen Park to another City-owned park, J.C. Snow Park); the height of the stage Drag Stars would erect for its performance (four feet); security arrangements and barricades; and the setup of booths in relation to the park's parking lot.

58.    On March 16, 2023, Reber stated that the complete permit application and related documents were "good" and that she would "finish things up and get back to" Drag Stars.

59.    Reber circulated Drag Stars's application, to the SERC, which consists of leaders across various City departments.  The members of the SERC did not raise any substantial concerns with Drag Stars's application.

## VI.    The City's Advertising Prohibition Was Not Enforced Previously.

60.    Since at least October 1, 2015, the City has had an ordinance, codified at Section 3-10-3 and 3-10-4(c) of the City Code, providing that: "No person . . . or other entity, public or private, shall promote, advertise or hold a special event without first obtaining a special event permit" (the "Advertising Prohibition").[26]

61.    The City Code does not make clear how violations of the Advertising Prohibition are addressed.  There is a provision in the chapter of the City Code addressing special events that

---

[26] Ordinance 2015-10-003.

provides that violations of the chapter constitute Class B misdemeanors, but it is vague as to whether this penalty might apply even to technical Advertising Prohibition violations.[27]

62.    For at least several years, the Advertising Prohibition was not enforced against applicants for special event permits.  Indeed, if the Advertising Prohibition were read to apply to communications that solicit event sponsors, vendors, or suppliers, then most special events could not be organized at all.

63.    As a City Council member recently stated on the record, due to City permitting processes, event permits are often not issued until the day of the event, or the day before the event.[28]  Read literally, the Advertising Prohibition would therefore ban all advertising for special events.

## VII.    The City Explores Using the Advertising Prohibition To Block Plaintiffs' Event Permit.

64.    In mid-March 2023—in response to Plaintiffs' permit application—certain City Councilmembers became very interested in beginning to enforce the Advertising Prohibition against applicants for events permits.

65.    On March 8, 2023, Councilmember Natalie Larsen emailed Reber asking for copies of upcoming event applications.  Reber responded by emailing Larsen Drag Stars's permit application as well as an application for an event titled "Pride 2023," stating: "Attached are a couple applications that were not discussed yet by SERC [the City's Special Events Review

---

[27] St. George, Utah City Code § 3-10-10.

[28] Community Education Channel, *St. George City Council April 6, 2023*, YouTube, 35:00 (Apr. 6, 2023) https://www.youtube.com/watch?v=XKJiLOTQj5A.

Committee] due to the sensitive nature."  The same day, Reber sent the same two attachments to Assistant City Manager Marc Mortensen, writing only: "Hello Marc, They are attached."

66.     On March 17, 2023, Drag Stars held a drag performance at a local private venue. That event drew a protest led by the Liberty Action Coalition, a far-right political organization reportedly connected to Councilmember Michelle Tanner.[29]

67.     On March 21, 2023, City Manager John Willis met with Reber, Marc Mortensen, and two attorneys from the City to discuss the City Councilmembers' request that City officials begin stringently enforcing the Advertising Prohibition.

68.     The same day, Assistant City Attorney Ryan Dooley assigned a legal intern to identify which special event applicants, out of a provided list, were violating the Advertising Prohibition.  The legal intern reported that *twelve* of the events were advertising ahead of their permit approvals, and that *only four* of the events were not yet advertising.

69.     Among the events listed as violating the Advertising Prohibition was Drag Stars's planned April 28, 2023 performance.  The intern attached two images related to the Drag Stars event, both of which were from a post Drag Stars had created on a public-facing web platform that allows event planners to facilitate vendor communications, contracts, and payments.  The graphic for the post stated that its location was "TBD."

---

[29] *See, e.g.*, Mark Eddington, *'They Are Grooming Our Children for Immoral Satanic Worship': Southern Utah Politicians Target Drag Shows*, Salt Lake Trib. (Oct. 21, 2022), https://www.sltrib.com/news/politics/2022/10/21/they-are-grooming-our-children/ (reporting on Councilmember Tanner's comments at a Liberty Action Coalition meeting centered on opposition to drag performances); Sean Hemmersmeier, *Campaign Finance Reports: Breakdown of St. George Candidates' Reports*, Spectrum (Oct. 29, 2021), https://www.thespectrum.com/story/news/2021/10/29/campaign-finance-reports-breakdown-st-george-candidates-reports/6181586001/ (reporting that the Liberty Action Coalition was a major donor to Councilmember Tanner's election campaign).

**VIII.   The City Imposes a Six-Month Moratorium on Special Event Permits.**

70.     At the same time that City officials were looking at the Advertising Prohibition as a pretext to deny Drag Stars's application for a permit, the City also took steps to prevent future applications from being approved.  On March 16, 2023, the City Council approved Ordinance No. 2023-03-003, which imposed a six-month moratorium on the Council granting new permits for special events on City property in the City of St. George, except for completed permit applications received by the City prior to March 15, 2023.  The stated reason for this moratorium was (1) to prevent overuse of parks pending a study of special events' impact on City facilities, and (2) to permit the Council to make changes to the City Code provisions governing permits for special events.

71.     Councilmember Natalie Larsen has stated on the Council record that the moratorium is needed to allow the City Council to clarify the Code provisions governing special events, which she characterized as ambiguous as written.[30]

72.     The City's moratorium on special events was pretext for its intent to prevent future drag performances in St. George, including any future applications by Plaintiffs.

73.     The City's motivation for preventing drag performances was its disapproval of the content and message of drag performance, which it deems offensive; as well as its disapproval of Plaintiffs' and prospective participants' LGBTQ+ identity and gender nonconforming behavior. Specifically, the City harbored generalized fears, negative attitudes, stereotypes, and moral disapproval of LGBTQ+ people, and people who fail to conform to sex stereotypes.

---

[30] Community Education Channel, *St. George City Council April 11, 2023*, YouTube, 37:40 (Apr. 11, 2023), https://www.youtube.com/watch?v=xO19HtFWqGw.

74.     After imposing the moratorium preventing drag organizers from securing permits for six months, City Council members then made a series of exceptions for recurring and City-sponsored events with speakers and messages that align with the beliefs of City Councilmembers.

IX.     **Defendants Deny Plaintiffs' Permit Application**

75.     On or about March 23, 2023, having had no further word from Reber, Avalōx traveled to City Hall to speak with Reber in person.  On this date, Avalōx, who had reviewed all of the City's permit requirements in an effort to fully comply with those requirements, orally requested permission to begin advertising the event.  Reber orally provided that permission.

76.     Based on Reber's approval, on March 26, 2023, Drag Stars held a photoshoot for a social media post advertising its planned April 28 event.  It posted the flyer on social media on March 30, 2023.  This was Plaintiffs' first public communication soliciting attendees for the event.

77.     On March 30 and 31, 2023, City officials received email complaints from residents opposed to drag shows.  These stated, among other things, that most of the City Council had been "supported" by voters in recent elections "because of [their] stance against" the LGBTQ+ community, and that Plaintiffs' planned show was "an abominable stunt which has the deliberate intent to expose children to sexual perversion."

78.     On March 29, 2023, Drag Stars received an email from the City seeking payment for Vernon Worthen Park.[31]

79.     On March 31, 2023, Avalōx visited City Hall to discuss this with Reber, who reassured Avalōx that the SERC was still signing off on the permit.

---

[31] The request for payment for Vernon Worthen Park specifically appears to have been an error, as by this time Plaintiffs had agreed to use J.C. Snow Park instead.

80.     However, an hour after speaking to Reber, Avalōx received a permit denial letter under Reber's signature.  The letter stated: "It has come to the City's attention that several applicants for special event(s) have publicly advertised the special event prior to a special event permit being granted or . . . issued; your event is one of them."  The letter then stated that the application had been denied due to "advertising prior to receiving city approval and/or a special event permit is issued"; it noted that City Code § 3-10-8(A) allows (though it does not require) the city to deny a permit "if: 1. The proposed special event violates a law, ordinance, policy, procedure, or regulation."

## X.     The City Denies Plaintiffs' Appeal

81.     On April 5, 2023, Plaintiffs timely appealed the permit denial to the full City Council.  In their appeal, Plaintiffs indicated they had complied with what they believe were the necessary paperwork and oral approval by the Special Events Coordinator to advertise the event prior to the issuance of the permit.

82.     On April 6, 2023, despite its decision to enforce the Advertising Prohibition against Drag Stars, the City Council voted to exempt a list of City-sponsored and recurring events from the Advertising Prohibition. The City Council created a brand-new exception to the Advertising Prohibition for all "reoccurring and City sponsored events," and designated nine other events identified as violating the Advertising Prohibition as falling within this new exception.[32]

---

[32] Section 3-10-4(c) of the St. George City Code now reads as follows:

> Events which are listed on the March 21, 2023, list of reoccurring events and events for which the city is a sponsor may promote and advertise the event after submission of a preliminary application, confirmation by city staff of the availability of the location and dates for the event, and payment of the application fee, if any.

83.     Eight of the nine events that were excused from the Advertising Prohibition were apparently exempted based on a "City sponsored" designation.

84.     Importantly, City sponsorship does not necessarily imply any financial or other involvement by the City.  In some cases, the City has instituted rules that certain spaces can only be used by City-sponsored events, and grants "sponsorship" merely in the form of allowing those events to take place.[33]  In circular fashion, "City sponsored" has meant "approved for a permit," even though the City now cites "sponsorship" as the basis for such approval.  In fact, the City Code does not define what it means to be "City sponsored."[34]

85.     At least one Councilmember has publicly noted that the City Council needs to "evaluate exactly what it means . . . to be city sponsored" and, having made that determination, explain it to the public.[35]

86.     During the April 6, 2023 City Council meeting, Councilmember Danielle Larkin observed that, because the permit usually does not issue until a day or two before the event, the

---

*See* City of St. George, Utah Ordinance No. 2023-04-001 (enacted Apr. 6, 2023).  Upon information and belief, the referenced "March 21, 2023 list of reoccurring events and events for which the city is a sponsor" is not publicly available.

[33] For example, the Council recently granted such "sponsorship" to a semiannual event called the St. George Market. *See* Community Education Channel, *St. George City Council January 5, 2023*, YouTube, at 1:16:00 (Jan. 5, 2023), https://www.youtube.com/watch?v=2FAkHVZ54Hk.  On the record, City Council members explicitly noted that the City was only sponsoring the St. George Market to the extent of allowing it to take place in a park restricted to City-sponsored events; the City would not be providing the market with financial support.  *Id.*

[34] *See* St. George City Code § 3-2-10 ("For purposes of this chapter, events organized and conducted by the city located on city-owned property or within city facilities are not special events; however, events held by non-city entities which may have some level of sponsorship by the city are special events.").

[35] Community Education Channel, *St. George City Council April 6, 2023*, YouTube, 2:00:25 (Apr. 6, 2023) https://www.youtube.com/watch?v=XKJiLOTQj5A.

Advertising Prohibition, if taken literally, would prevent many events from taking place altogether.[36]

87.    In effect, carving out City-sponsored events from the Advertising Prohibition amounted to the City Council granting the City unfettered discretion to decide which events are subject to the Advertising Prohibition and which are not; applying the carve-out retroactively allowed the City to selectively enforce the Advertising Prohibition against Plaintiffs, along with two other events as collateral damage.

88.    At that same April 6, 2023 meeting, the City Council discussed the Advertising Prohibition and the moratorium.  Immediately after the City Council addressed the moratorium issue, a large group of St. George residents addressed the Council in opposition to drag events in St. George and in favor of the moratorium.  Members of this group stated on the record that "parents attempting to promote gender dysphoria are essentially promoting their own child's suicide"; that bringing children to drag shows is "child sexual abuse"; that drag consists of "confused adults playing dress-up in the park and performing lewd acts"; that gay people should "get out of the public square"; and that St. George was "in a war zone . . . good against evil"; one woman told the Council: "Ask yourself: Why do they repeatedly seek an audience of children?"[37] These individuals were affiliated with an explicitly anti-drag organization called "Protect Utah's Kids."[38]

---

[36] Community Education Channel, *St. George City Council April 6, 2023*, YouTube, 35:00 (Apr. 6, 2023) https://www.youtube.com/watch?v=XKJiLOTQj5A.

[37] Community Education Channel, *St. George City Council April 6, 2023*, YouTube (Apr. 6, 2023) https://www.youtube.com/watch?v=XKJiLOTQj5A.

[38] *See Protect Utah's Kids* (last visited Apr. 25, 2023), https://protectutahskids.com/.

89.     After the Council meeting, Councilmember Tanner publicly posted on social media in support of "Protect Utah's Kids," showing herself wearing a T-shirt with the organization's logo and praising the "abundance of passionate public comments made in support of protecting children."[39]

90.     Defendant's action to excuse nearly all of the events from the Advertising Prohibition calls into question why certain City Councilmembers suddenly felt it was urgent to begin enforcing it in March 2023.  Upon information and belief, those City Councilmembers specifically invoked that long-dormant rule in an effort to prohibit Plaintiffs' proposed drag event.

91.     Avalōx was informed on April 7, 2023, the Friday before Easter weekend, that Plaintiffs' appeal would be heard by the Council on the following Tuesday, April 11, 2023.

92.     The City Council met on April 11, 2023 for the purpose of hearing appeals from both Drag Stars and Indigo Klabanoff.

93.     At the meeting, Councilmember Dannielle Larkin raised concerns that the Advertising Provision was insufficiently clear; for example, it was not obvious whether Drag Stars had violated the prohibition by seeking vendors for the event without even specifying that it would take place in St. George.  However, the other four City Councilmembers each took the position that City Code provisions are meant to be followed, even when they are vague.

94.     The Council denied both appeals, with only one member, Larkin, voting to grant the permits.

---

[39]     Michelle     Tanner     (@michelletannerusa),     Instagram     (Apr.     6,     2022), https://www.instagram.com/p/CquC_gwtAFr/.

95.     At this April 11, 2023 appeal hearing, Councilmember Natalie Larsen stated that she had been "after [changes to the City special event permit scheme] for a good nine months." On this timeline, Larsen began working on revisions to the permit scheme shortly after the *We're Here* controversy.

96.     Plaintiffs had a separate drag event at a private venue planned for April 28, 2023, but this event was also cancelled following the denial of Plaintiffs' permit application.  Upon information and belief, the owners of the venue, Siva Pasefika, were intimidated by threats against the safety of their employees, and therefore rescinded their offer to host the event.

97.     Upon information and belief, the owners of Siva Pasefika are declining to hold any drag events for the foreseeable future to avoid being targeted by anti-drag activists and officials.

98.     Upon information and belief, at least one person who taught dance lessons at the venue—and had had no personal involvement with Drag Stars or drag generally—has been driven away from the venue due to threats of violence from drag opponents.

## XI.     The City's Permit Denial and Moratorium Erase Drag from Public Spaces

99.     Collectively, the City's March 31, 2023 denial of Plaintiffs' permit application, April 6 denial of Plaintiffs' appeal, and the March imposition of a six-month moratorium on special events permits, are naked attempts to prevent drag performances in St. George. Defendants' discrimination against drag performance is animated by animus against gender nonconforming conduct and Plaintiffs' LGBTQ+ affiliation.

100.    The City's discriminatory actions caused plaintiffs substantial harm and sent a message that drag performance, and the LGBTQ+ community, are unwelcome.

101.    Absent court intervention, Plaintiffs will be unable to hold public drag performances, like the one they planned for April 28, 2023, in St. George.

**XII.    Plaintiffs Are Suffering Ongoing and Irreparable Harm To Their Constitutional Rights**

102.    Plaintiff Avalōx, who is also a drag performer, has been irreparably injured by the City's actions barring her from engaging in protected expression by performing at the April 28 event.

103.    Plaintiffs have been barred from engaging in artistic and political speech, which fall within the core of First Amendment protections, in support of LGBTQ+ rights and gender-nonconformity.  Moreover, Defendants have prohibited Plaintiffs from expressing a viewpoint in support of drag, LGBTQ+ rights, and gender nonconformity *because* they agree or are sympathetic to the opposite viewpoint.

104.    In addition to losing the expected revenue associated with holding a large public event, Plaintiffs have suffered direct and indirect financial losses, such as non-refundable security deposits, along with the time and resources invested into planning the event, as a result of Defendant's discriminatory denial of Plaintiffs' permit application.

105.    Plaintiffs have discussed accommodations with some of the vendors and performers who planned to participate in the April 28 event, which will enable Plaintiffs to avoid some of the consequences of Defendant's discriminatory actions if they can hold the planned event this June. Plaintiffs are prepared to organize an event on that schedule immediately upon entry of any relief allowing them to host an event in a public space in St. George.

106.    Plaintiffs also stand to suffer irreparable loss of goodwill and damage to their reputation among vendors, sponsors, and the broader community if the City continues to refuse Plaintiffs' special event application.  These stakeholders will take away the message that when Plaintiffs attempt to organize an event in St. George, it is likely to fall through.

25

107.    Following the *We're Here* controversy, Defendants have switched tactics in an effort to erase drag or LGBTQ+ themed performances. Rather than explicitly prohibit them, Defendants are stamping out drag by denying it a home in the City. Defendants' denial of Plaintiffs' permit was transparently another step in its campaign to deny Drag Stars a public location for its protected speech.

108.    St. George is Plaintiff Avalōx's home, and prospective event participants are her community.  By denying her the opportunity to speak, Defendants have communicated that she is unwelcome, and that she is not worthy of sharing the same public space as all other residents.

109.    If holding public, all-ages drag events expresses a message of inclusivity, visibility, and acceptance, then when a city prohibits drag events, that prohibition sends a message that LGBTQ+ identities should be excluded, invisible, and not accepted.  By denying the LGBTQ+ community the space to hold these events, Defendants make crystal clear that LGBTQ+ identities do not meet their "community standards" and are not welcome in public spaces.

110.    Plaintiff Avalōx founded her organization on the ideal that she and her LGBTQ+ community are "Rebelling by Existing."   Defendants have made every effort to erase that existence.

## FIRST CLAIM FOR RELIEF

### Violation of the First Amendment
### Freedom of Speech – Content-Based and Viewpoint-Based Discrimination.

111.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

112.    The First Amendment protects speech and expressive conduct, including performance theater.  "[L]ive entertainment, such as musical and dramatic works fall within the First Amendment guarantee."  *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981).

113.    Plaintiffs' planned performance also constitutes political expression.

114.    Officials acting under the color of law cannot censor or restrict speech based on its content, "its message," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992), or the identity of its speaker if such reflects a governmental preference or disfavor based on the substance of the speaker's speech, *Turner Broad. System, Inc. v. F.C.C.*, 512 U.S. 622, 657–58 (1994), unless "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Widmar v. Vincent,* 454 U.S. 263, 267-70 (1981).

115.    Officials acting under the color of law cannot censor or restrict speech based on the viewpoint expressed, even if offensive to the official or other citizens.  "Giving offense is a viewpoint . . . [T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Matal v. Tam*, 582 U.S. 218, 243-44 (2017) (internal quotation marks omitted).

116.    Officials acting under the color of law cannot enforce facially neutral laws in a discriminatory manner.  *Thomas v. Chicago Park Dist*., 534 U.S. 316, 325 (2002); *Pahls v. Thomas*, 718 F.3d 1210, 1236 (10th Cir. 2013).

117.    As alleged above, the City's policy and practice restrict and chill Plaintiffs' speech and expression protected by the First Amendment based on its content, its message, its speaker, and its viewpoint.

118.     Defendants engaged in unconstitutional discrimination by denying Plaintiffs' permit application because Defendants disagree with the viewpoint and content of the event, and also because of Plaintiffs' affiliation with the LGBTQ+ community.

119.     The City's practice of refusing licensing for drag performances is chilling and will continue to chill Plaintiffs' ability to organize similar events that convey political, ideological, or cultural messages that Defendants believe to be offensive.  These include Plaintiffs' intended future drag performances, including the one Plaintiffs had originally planned for April 28, 2023 but are now planning for June 2023.

120.     Plaintiffs have no adequate legal, administrative, or other remedy to prevent or minimize the immediate, irreparable, and ongoing harm to their First Amendment rights from Defendants' unconstitutional discrimination.

121.     Defendants' actions have caused, and are continuing to cause, Plaintiffs to suffer substantial monetary damages.

122.     Pursuant to 42 U.S.C. § 1983, Defendants are liable to Plaintiffs in law and equity for depriving Plaintiffs of their "rights, privileges, or immunities secured by" the First Amendment.

123.     Moreover, in its capacity as a court of equity, this Court has the power to review and restrain unconstitutional action by state actors.  *Armstrong*, 575 U.S. at 326-27.  Absent injunctive and declaratory relief preventing its discriminatory permitting practices, Defendants' unconstitutional conduct will have an ongoing chilling effect on Plaintiffs' protected expression.

## SECOND CLAIM FOR RELIEF

### Violation of the First Amendment
### Freedom of Speech – Exclusion From Public Forum

124.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

125.    St. George's city parks and public spaces are traditional public forums, which, "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939); *see Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

126.    In traditional public forums, the government's right "to limit expressive activity [is] sharply circumscribed." *Perry Educ. Ass'n, v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

127.    To restrict speech in a public forum based on its content, the government must satisfy strict scrutiny – it must prove that the regulation is narrowly tailored to serve a compelling government interest and is the least restrictive alternative. *Boos v. Barry*, 485 U.S. 312, 321 (1988).

128.    Vernon Worthen Park, J.C. Snow Park, and other City property that the City has made available to the public for special events are public forums.

129.    Plaintiffs are required by City ordinance to obtain a special event permit in order to conduct their planned drag performance.  When the City imposed a six-month moratorium on special events permits, it effectively prohibited Plaintiffs from conducting their planned drag performance or any similar performance in the near future.

130.   The City's denial of Plaintiff's special event permit application, and the City's imposition of a six-month moratorium on special events permits, were content-based restrictions on Plaintiffs' speech.

131.   Defendants unconstitutionally restricted Plaintiffs' speech in a public forum by denying them a permit, and by imposing a six-month moratorium on special events permits, without a compelling state interest, and without narrowly tailoring their permitting practices to any compelling state interest.  Plaintiffs have no available alternative means to hold drag events in public parks.

132.   Plaintiffs have no adequate legal, administrative, or other remedy to prevent or minimize the immediate, irreparable, and ongoing harm to their First Amendment rights from Defendants' unconstitutional discrimination.

133.   Defendants' actions have caused, and are continuing to cause, Plaintiffs to suffer substantial monetary damages.

134.   Pursuant to 42 U.S.C. § 1983, Defendants are liable to Plaintiffs in law and equity for depriving Plaintiffs of their "rights, privileges, or immunities secured by" the First Amendment.

135.   Moreover, in its capacity as a court of equity, this Court has the power to review and restrain unconstitutional action by state actors.  *Armstrong*, 575 U.S. at 326-27.  Absent injunctive and declaratory relief preventing its discriminatory permitting practices, the City's unconstitutional conduct will have an ongoing chilling effect on Plaintiffs' protected expression.

**THIRD CLAIM FOR RELIEF**

**Violation of the First Amendment**
**Freedom of Speech – Prior Restraint**

136.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

137.    It is clearly established that an official acting under the color of law cannot impose prior restraints on commercial speech when that speech concerns lawful activity and is not misleading, and when the restriction is "more extensive than is necessary" to advance a "substantial" government interest. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980).

138.    It is clearly established that an official acting under the color of law cannot impose prior restraints on commercial speech if it has not "'carefully calculate[d] the costs and benefits associated with the burden on speech imposed' by the regulations." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 561 (2001) (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 (1993)).

139.    It is clearly established that an official acting under the color of law cannot impose a licensing scheme that permits government officials unfettered discretion to grant or deny permission. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990); *ACORN v. City of Tulsa*, 835 F.2d 735, 740 (10th Cir. 1987).

140.    Defendants imposed an unconstitutional prior restraint of speech when they restricted all advertising of special events prior to permit approval, and when they imposed a six-month moratorium on the issuance of special event permits.

141. Defendants imposed prior restraints "more extensive than is necessary" to achieve any government interest and absent a "substantial" interest.

142. Defendants' restrictions on event advertising, and their six-month moratorium on special events permits, are chilling and will continue to chill Plaintiffs' ability to organize similar events that convey political, ideological, and cultural messages—as well as speech that furthers Plaintiffs' commercial interests.  These include Plaintiffs' intended future drag performances, including one Plaintiffs are planning for June 2023.

143. Plaintiffs have no adequate legal, administrative, or other remedy to prevent or minimize the immediate, irreparable, and ongoing harm to their First Amendment rights from Defendants' unconstitutional prior restraint.

144. Defendants' actions have caused, and are continuing to cause, Plaintiffs to suffer substantial monetary damages.

145. Pursuant to 42 U.S.C. § 1983, Defendants are liable to Plaintiffs in law and equity for depriving Plaintiffs of their "rights, privileges, or immunities secured by" the First Amendment.

146. Moreover, in its capacity as a court of equity, this Court has the power to review and restrain unconstitutional action by state actors.  *Armstrong*, 575 U.S. at 326-27.

147. Absent injunctive and declaratory relief preventing its discriminatory permitting practices, Defendants' unconstitutional conduct will have an ongoing chilling effect on Plaintiffs' protected expression.

## FOURTH CLAIM FOR RELIEF

### Violation of the First Amendment
### Freedom of Speech – Overbreadth

148.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

149.    A government entity cannot restrict a substantial amount of protected speech in its efforts to circumscribe nonprotected speech.  *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999); Broadrick v. Oklahoma, 413 U.S. 601, 612–15 (1973).

150.    The City Code section addressing special event permits provides that "No person . . . or other entity, public or private, shall promote, advertise, or hold a special event without first obtaining a special permit." St. George City Code § 3-10-3.  Because special event permits are often granted just days or hours before a special event, these ordinances restrict a "substantial" amount of speech relating to the promotion and advertising of special events.

151.    Additionally, the City's six-month moratorium on the issuance of virtually *all* special events permits restricts a "substantial" amount of speech.

152.    The City's restrictions on event advertising are chilling and will continue to chill Plaintiffs' ability to organize events that convey political, ideological, and cultural messages—as well as speech that furthers Plaintiffs' commercial interests.  The restrictions particularly affect drag performances Plaintiffs intend to stage, including a performance in June 2023.

153.    Plaintiffs have no adequate legal, administrative, or other remedy to prevent or minimize the immediate, irreparable, and ongoing harm to their First Amendment rights from Defendants' unconstitutionally overbroad restrictions on event advertising.

154.     Defendants' actions have caused, and are continuing to cause, Plaintiffs to suffer substantial monetary damages.

155.     Pursuant to 42 U.S.C. § 1983, Defendants are liable to Plaintiffs in law and equity for depriving Plaintiffs of their "rights, privileges, or immunities secured by" the First Amendment.

156.     Moreover, in its capacity as a court of equity, this Court has the power to review and restrain unconstitutional action by state actors.  *Armstrong*, 575 U.S. at 326-27.

157.     Absent injunctive and declaratory relief preventing its enforcement of these ordinances, the City's unconstitutional conduct will have an ongoing chilling effect on Plaintiffs' protected expression.

## FIFTH CLAIM FOR RELIEF

### Violation of the Fourteenth Amendment
### Due Process – Vagueness

158.     Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

159.     A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1201 (10th Cir. 2005).   This principle applies to administrative, civil, and criminal prohibitions.  *See, e.g., FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentilev v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule).

160.     "The vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution."  *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961).

So, where First Amendment rights are at stake, "[s]tricter standards of permissible statutory vagueness may be applied." *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (quoting *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 620 (1976)).

161.    A government entity cannot impose restrictions on speech that "fail[] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct" is prohibited or "authorize[] or even encourage[] arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

162.    The City Code provides that "No person . . . or other entity, public or private, shall promote, advertise, or hold a special event without first obtaining a special permit," and that a violation of that subsection is class B misdemeanor.  St. George City Code §§ 3-10-3; 3-10-10.

163.    These ordinances fail to establish standards sufficient to put people of ordinary intelligence on notice of the scope of the restriction.  Permit applicants, including Plaintiffs, are confused about what communications with vendors, sponsors, and prospective participants constitutes "promotion" or "advertising" in violation of City ordinances.

164.    The City's ordinances are insufficiently defined to curb discriminatory enforcement.  In fact, the City has employed its unfettered discretion under the ordinances to discriminatorily enforce them against Plaintiffs in violation of Plaintiffs' First and Fourteenth Amendment rights.

165.    The City's restrictions on event advertising are chilling and will continue to chill Plaintiffs' ability to organize events that convey political, ideological, and cultural messages—as well as speech that furthers Plaintiffs' commercial interests.  These include Plaintiffs' intended future drag performances, including one Plaintiffs are hoping to have in June 2023.

166.    Plaintiffs have no adequate legal, administrative, or other remedy to prevent or minimize the immediate, irreparable, and ongoing harm to their First Amendment and due process rights from Defendants' unconstitutionally vague restrictions on event advertising.

167.    Defendants' actions have caused, and are continuing to cause, Plaintiffs to suffer substantial monetary damages.

168.    Pursuant to 42 U.S.C. § 1983, Defendants are liable to Plaintiffs in law and equity for depriving Plaintiffs of their "rights, privileges, or immunities secured by" the First and Fourteenth Amendments.

169.    Moreover, in its capacity as a court of equity, this Court has the power to review and restrain unconstitutional action by state actors. *Armstrong*, 575 U.S. at 326-27.

170.    Absent injunctive and declaratory relief preventing its enforcement of these ordinances, the City's unconstitutional conduct will have an ongoing chilling effect on Plaintiffs' protected expression.

**SIXTH CLAIM FOR RELIEF**

**Violation of the Equal Protection Clause of the Fourteenth Amendment
Sex and LGBTQ+ Discrimination**

171.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

172.    By denying Plaintiffs' special events permit, Defendants are engaging in discrimination on the basis of sex and LGBTQ+ status in violation of Plaintiffs' Fourteenth Amendment right to equal protection under the law.

173.    Officials acting under the color of law may not discriminate on the basis of sex, sexual orientation, transgender status, or gender non-conformity when enforcing of a facially

neutral law.  *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977).

174.    Discrimination on the basis of sex is presumptively unconstitutional and subject to heightened judicial scrutiny.  *United States v. Virginia*, 518 U.S. 515, 533 (1996); *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 799 (10th Cir. 2019).

175.    Discrimination on the basis of nonconformity with sex stereotypes, gender, gender identity, and sex characteristics are all forms of discrimination on the basis of sex.  *Frontiero v. Richardson*, 411 U.S. 677, 687-88 (1973) (plurality opinion); *J.E.B. v. Alabama*, 511 U.S. 127, 138 (1994); *cf. Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741-42 (2020).

176.    Government discrimination based on LGBTQ+ status also is presumptively unconstitutional and subject to at least heightened scrutiny.

177.    LGBTQ+ persons have suffered a long history of discrimination in Utah and across the country and continue to suffer such discrimination to this day.  They are a discrete and insular group and lack the political power to protect their rights through the legislative process.  They largely have been unable to secure explicit legal protections against discrimination.  Their LGBTQ+ status bears no relation to their ability to contribute to society.  And LGBTQ+ identity is a core, defining trait so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

178.    Drag performance involves gender nonconforming dress and comportment.  Its history and current practice are symbolically associated with the LGBTQ+ community, and drag performers are disproportionately LGBTQ+ persons.

179.    Defendants denied Plaintiffs' special event permit application based on Plaintiffs' and prospective participants' LGBTQ+ identity, and based on participants' nonconformance to gender-stereotyped dress and comportment.

180.    By denying Plaintiffs' special event permit application, Defendants are engaging in constitutionally impermissible discrimination based on sex and LGBTQ+ status.

181.    The City's permitting actions are not narrowly tailored to achieve a compelling governmental interest.  They are not substantially related to any important government interest. And they are not rationally related to any legitimate government interest.

182.    The City's targeted restrictions on permitting is based on generalized fears, negative attitudes, stereotypes, and moral disapproval of LGBTQ+ people, and people who fail to conform to sex stereotypes, which are not legitimate bases for unequal treatment under any level of scrutiny.

183.    Defendants' actions have caused, and are continuing to cause, Plaintiffs to suffer substantial monetary damages.

184.    Pursuant to 42 U.S.C. § 1983, Defendants are liable to Plaintiffs in law and equity for depriving Plaintiffs of their "rights, privileges, or immunities secured by" the Fourteenth Amendment.

185.    Moreover, in its capacity as a court of equity, this Court has the power to review and restrain unconstitutional action by state actors.  *Armstrong*, 575 U.S. at 326-27.

### SEVENTH CLAIM FOR RELIEF

**Violation of Article I, § 24 of the Utah Constitution, Uniform Operation of Laws Clause
Sex and LGBTQ+ Discrimination**

186.     Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

187.     Plaintiffs bring this claim against all Defendants for purposes of seeking declaratory and injunctive relief.

188.     The Uniform Operation Clause of the Utah Constitution states that: "All laws of a general nature shall have uniform operation." Utah Const. art. I, § 24. This is "a rule of uniformity in the actual application of . . . classifications." *In re Adoption of J.S.*, 358 P.3d 1009, 1026 (Utah 2014).

189.     In addressing claims under the Uniform Operation Clause, Utah courts apply a three-step inquiry, asking (1) whether the statute creates classifications; if so, (2) whether the classifications impose any disparate treatment on similarly situated persons; and, (3) if there is disparate treatment, whether the legislature had any reasonable objective that warrants the disparity." *Count My Vote, Inc. v. Cox*, 452 P.3d 1109, 1115 (Utah 2019).

190.     As pertinent here, a statute that discriminates on the basis of suspect classifications (such as race or gender), or that implicates important or fundamental rights, merits "a heightened degree of scrutiny" at the third step. *Gallivan v. Walker*, 54 P.3d 1069, 1085 (Utah 2002). Under that framework, "in order for a discriminatory classification to be constitutional it must be reasonably necessary to further, and in fact must actually and substantially further, a legitimate legislative purpose." *Id.* at 1086.

191.   "When persons are similarly situated, it is unconstitutional to single out one person or group of persons from among a larger class on the basis of a tenuous justification that has little or no merit."  *Malan v. Lewis*, 693 P.2d 661, 671 (Utah 1984).  And when there are "many exceptions to [a] general rule," the enforcement of that rule is the "grant of a special privilege to the excepted classes without a legal excuse for not granting the same privilege to others."  *Id.* (cleaned up).

192.   Defendants' denial of Drag Stars's event permit application fails heightened scrutiny because it is not reasonable, does not actually and substantially further a valid government objective, and is not reasonably necessary to further a legitimate purpose.

193.   Plaintiffs are similarly situated in all relevant respects to other applicants for special events permits, and yet they have been unconstitutionally singled out for denial because of their LGBTQ+ identity and affiliation.  Defendants have no justification for distinguishing between Plaintiffs and other applicants for special events permits.  Defendants' discrimination against LGBTQ+ applicants does not further the objectives of St. George's permitting ordinances.

194.   Defendants excepted so many events from their Advertising Prohibition, and from their six-month moratorium on special events permits, that the enforcement of the Advertising Prohibition and the moratorium against Plaintiffs is unconstitutional discrimination.

195.   Defendants' targeted restrictions cannot even survive rational basis review because they lack any rational basis and are based on generalized fears, negative attitudes, stereotypes, and moral disapproval of LGBTQ+ people, and people who fail to conform to sex stereotypes, which are not legitimate bases for unequal treatment under any level of scrutiny.

## EIGHTH CLAIM FOR RELIEF

### Violation of Article IV, § 1 of the Utah Constitution, Equal Protection Rights Sex and LGBTQ+ Discrimination

196.    Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

197.    Plaintiffs bring this claim against all Defendants for purposes of seeking declaratory and injunctive relief.

198.    Article IV, Section 1 of the Utah Constitution provides: "The rights of citizens of the State of Utah to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this State shall enjoy equally all civil, political and religious rights and privileges."

199.    By denying Plaintiffs' special events permit, Defendants are engaging in discrimination on the basis of sex and LGBTQ+ status in violation of the Equal Rights Amendment.

200.    Under the Utah Constitution, government classification or discrimination on the basis of sex is subject to heightened scrutiny and are presumptively unconstitutional.

201.    Moreover, for the same reasons stated in Plaintiffs' sixth claim for relief, Defendants' actions cannot survive under heightened scrutiny and cannot survive even rational basis review because it lacks any legitimate purpose, rests on invidious stereotypes, and is not rationally related to any purported state interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1. Enter a declaratory judgment that Defendants' special event licensing scheme, including its advertising restriction and six-month moratorium on special events, as implemented against Plaintiffs, violates the First and Fourteenth Amendments to the United States Constitution and Article I, section 24 and IV, section 1 of the Utah Constitution.

2. Enter a declaratory judgment that Defendants' discriminatory denial of Plaintiffs' event permit application violated the First and Fourteenth Amendments to the United States Constitution and Articles I, section 24 and IV, section 1 of the Utah Constitution.

3. Award Plaintiffs a preliminary and permanent injunction preventing the City from: unconstitutionally denying Plaintiffs special events permits to host drag performances; enforcing the six-month moratorium on special events against Plaintiffs; and enforcing the advertisement ban against drag performances organized by Plaintiffs;

4. Order Defendants to approve Plaintiffs' special events permit application, and issue the same, for an event dated June 30, 2023 or an alternative date in June agreed upon by the parties;

5. Retain jurisdiction of this action to render any further orders that this Court may deem appropriate;

6. Award Plaintiffs damages in an amount to be proven at trial;

7. Award Plaintiffs their costs and expenses, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 or other applicable statutes; and

8. Grant Plaintiffs such other and further relief as the Court deems just and proper.

Date:   May 23, 2023                                    Respectfully submitted,

/s/ *Valentina De Fex*
Valentina De Fex                                       Jeremy Creelan*
John Mejia                                             Rémi Jaffré*
**AMERICAN CIVIL LIBERTIES UNION**                     Owen W. Keiter*
    **OF UTAH FOUNDATION**                             **JENNER & BLOCK LLP**
311 South State Street, Suite 310                      1155 Avenue of the Americas
Salt Lake City, Utah  84111                            New York, NY 10036
(801) 521-9862                                         (212) 891-1600
vdefex@acluutah.org                                    JCreelan@jenner.com
jmejia@acluutah.org                                    RJaffre@jenner.com
                                                       OKeiter@jenner.com
Emerson Sykes*
Joshua A. Block*                                       Nathaniel Castellano*
Elizabeth Gyori*                                       **JENNER & BLOCK LLP**
**AMERICAN CIVIL LIBERTIES UNION**                     1099 New York Avenue, NW, Suite 900
    **FOUNDATION**                                     Washington, DC 20001
125 Broad Street, Floor 18                             (202) 639-6000
New York, NY 10004                                     NCastellano@jenner.com
(212) 549-2500
esykes@aclu.org                                        Meredith Hurley*
jblock@aclu.org                                        Jocelyn Sitton*
egyori@aclu.org                                        **JENNER & BLOCK LLP**
                                                       353 N. Clark Street
*Application for admission pro hac vice*               Chicago, IL 60654
*forthcoming.*                                         (312) 222-9350
                                                       MHurley@jenner.com
                                                       JSitton@jenner.com