## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, SOUTHERN REGION

|  |  |
|---|---|
| SOUTHERN UTAH DRAG STARS;<br><br>MITSKI AVALŌX,<br><br>                Plaintiffs,<br><br>      v.<br><br>CITY OF ST. GEORGE;<br><br>CITY COUNCIL OF ST. GEORGE;<br><br>COUNCILMEMBER JIMMIE HUGHES, in his official capacity;<br><br>COUNCILMEMBER DANNIELLE LARKIN in her official capacity;<br><br>COUNCILMEMBER NATALIE LARSEN in her official capacity;<br><br>COUNCILMEMBER GREGG MCARTHUR in his official capacity;<br><br>COUNCILMEMBER MICHELLE TANNER in her official capacity;<br><br>MAYOR MICHELE RANDALL in her official capacity;<br><br>CITY MANAGER JOHN WILLIS in his official capacity,<br><br>                Defendants. | Case No. 4:23-cv-00044-PK<br><br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

SUMMARY OF REQUESTED RELIEF ................................................................. 2

STATEMENT OF FACTS ........................................................................................ 3

ARGUMENT .............................................................................................................. 8

I.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR FREE
     SPEECH CLAIMS.............................................................................................. 9

   A.  Drag Performances Are Speech Protected Under the First Amendment. ........... 9

   B.  The City Impermissibly Discriminated Against Plaintiffs Based On Their
       Viewpoint and the Content Of Their Speech in a Traditional Public Forum. ................ 10

       1.  The City's denial of Plaintiffs' permit application fails strict scrutiny...................... 11

           (a)  The denial of Plaintiffs' permit was content- and viewpoint-based
                discrimination. ...................................................................................... 11

           (b)  The City fails to identify a compelling interest. .................................... 14

           (c)  The denial of the permit is not narrowly tailored to, or the least restrictive
                means of, furthering a compelling interest............................................. 15

       2.  The City's six-month moratorium is also unconstitutional........................................ 15

           (a)  The Moratorium is content- and viewpoint-based discrimination. ...................... 15

           (b)  The City does not have a compelling interest in enacting the moratorium
                ...................................................................................................... 16

           (c)  The City's moratorium is not narrowly tailored to, or the least restrictive
                means of, furthering a compelling interest............................................. 17

   C.  The Denial of Plaintiffs' Permit and Moratorium Also Fail Intermediate
       Scrutiny. ....................................................................................................... 17

   D.  The Licensing Scheme and Permit Denial Are Impermissible Prior Restraints. .............. 19

       1.  The Permitting Scheme does not satisfy the requirements for a licensing
           scheme for expressive activities and simply operates to block Plaintiffs'
           protected speech....................................................................................... 19

           (a)  The Permitting scheme provides officials with excessive discretion to
                deny permits.......................................................................................... 19

(b) The permitting scheme does not guard against undue delay. ............................... 21

    2.  The Advertising Prohibition is itself an impermissible prior restraint on commercial speech. ........................................................................................ 21

   E.  The Advertising Prohibition And Moratorium Are Unconstitutionally Overbroad. ....................................................................................................... 23

   F.  The Advertising Prohibition And Moratorium Are Unconstitutionally Vague. ............... 24

III. THE OTHER FACTORS SUPPORT A PRELIMINARY INJUNCTION. ........................... 25

   A.  Absent The Grant Of An Injunction, Plaintiffs Will Continue to Suffer Irreparable Harm. ..................................................................................... 25

   B.  The injunction is not adverse to the public interest and the permit denial's injury to Plaintiffs' outweighs any alleged damage to Defendants. ............................................. 27

V. NO BOND SHOULD BE REQUIRED IF THE COURT ISSUES THE INJUNCTION. ................................................................................................. 27

CONCLUSION ............................................................................................... 28

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs Southern Utah Drag Stars ("Drag Stars") and Mitski Avalōx (together, "Plaintiffs"), by and through counsel, respectfully move for a preliminary injunction ordering Defendants the City of St. George, the City Council of St. George, and Councilmembers Jimmie Hughes, Dannielle Larkin, Natalie Larsen, Gregg McArthur, Michelle Tanner, Mayor Michele Randall, and City Manager John Willis (collectively, "Defendants" or the "City") to reverse their denial of a special event permit to Plaintiffs for their "Our Allies & Community Drag Show."

## INTRODUCTION

Plaintiffs seek a preliminary injunction to remedy the City's ongoing violation of Plaintiffs' constitutional rights based on the City's disapproval of drag shows.

Drag Stars is an organization run by Mitski Avalōx that hosts drag shows and other events aimed at fostering inclusivity for the LGBTQ+ community. In March 2023, Drag Stars submitted a special event permit application to reserve a park in April 2023 for an event titled "Our Allies & Community Drag Show." Despite repeatedly assuring Plaintiffs that their application was compliant and would be granted, the City rejected it on March 31, claiming that Plaintiffs violated City Code § 3-10-4(C)—a provision that is believed to have *never* previously been enforced. Additionally, while Plaintiffs' application was pending, the City Council enacted a six-month moratorium on considering any new special events permit applications filed after March 15, 2023.

The City orchestrated these actions to prevent Plaintiffs' drag show and future similar events from happening in St. George because Defendants object to the show's content and viewpoint, and want to silence its organizers and prospective participants.  Bowing to a pressure campaign by vocal opponents of drag in St. George and to well-documented anti-drag sentiments expressed by certain City Council members, the City in effect prohibited Plaintiffs from hosting

their event this spring. The City Council hastily changed its ordinances and enforcement practices to create pretextually neutral reasons to suppress Plaintiffs' speech.

Public drag events serve a crucially important social and political purpose. They provide a welcoming message and safe space for the LGBTQ+ community, including its most vulnerable members, who may have few support networks in smaller communities like St. George and who too often face discrimination and threats. Rather than support drag performers and the LGBTQ+ community, the City has chosen to silence them and exclude them from public spaces.

The City engaged in numerous constitutional violations of Plaintiffs' rights. Denying Plaintiffs a permit was an impermissible viewpoint- and content-based restriction on Plaintiffs' speech and an impermissible prior restraint. The ordinances the City purported to enforce are overbroad and void for vagueness. The City's moratorium on special event permits is also an impermissible prior restraint. Plaintiffs respectfully ask that the Court promptly issue a preliminary injunction reversing Defendants' denial of the special event permit to which Plaintiffs are entitled.

## SUMMARY OF REQUESTED RELIEF

Pursuant to Fed. R. Civ. P. 65 and District of Utah Local Rule 7-1, Plaintiffs respectfully request that this Court:

1) Issue a preliminary injunction ordering the City of St. George to reverse its denial of Plaintiffs' special event permit application to host a drag show in Vernon Worthen Park on June 30, 2023 or another location and date in June to be mutually agreed by the Parties.

2) Waive the requirement in Fed. R. Civ. P. 65(c) for Plaintiffs to post a bond.

## STATEMENT OF FACTS

The U.S. has recently seen a dramatic increase in hate crimes against the LGBTQ+ community and threats to the safety LGBTQ+ individuals.[1] Utah and St. George in particular are unfortunately no exception to this rising tide of hate.[2]

Last year, HBO's drag-themed show *We're Here* taped an episode in St. George that involved a drag show in a city park. Certain Councilmembers, backed by a vocal contingent of anti-drag activists, unsuccessfully tried to revoke HBO's permit and prevent drag shows in the presence of children.[3] Following this incident, the anti-drag movement in St. George actively continues to speak and act against drag events.[4]

Plaintiff Southern Utah Drag Stars ("Drag Stars") was founded in November 2022 as an effort to push back against erasure of LGBTQ+ identities and anti-LGBTQ+ efforts. Its sole employee and owner is Mitski Avalōx, a transgender woman, drag performer, and resident of Hurricane, Utah, just outside St. George.[5] Drag Stars is a grassroots initiative which facilitates and organizes inclusive drag shows.[6] These shows empower and celebrate rural communities through

---

[1] *See* Cinnamon Janzer, *LGBTQ Communities in the US Face 'Rising Threat of Violence,'* Al Jazeera (Dec. 12, 2022), https://www.aljazeera.com/news/2022/12/12/lgbtq-communities-in-the-us-face-rising-threat-of-violence; David Klepper, *Anti-LGBTQ Hate Thrives Online, Spurs Fears of More Violence*, Associated Press (Dec. 17, 2022), https://apnews.com/article/technology-shootings-business-social-media-colorado-75a3c597a60dca0f116d5deb6a6c1a6b.

[2] *See, e.g.,* HB 11 (2022); SB 16 (2023); SB 93 (2023); HB 209 (2023); Mark Eddington, *What St. George Residents Said About Drag Shows at Divided Council Meeting*, Salt Lake Trib. (Nov. 4, 2022), https://www.sltrib.com/news/politics/2022/11/04/what-st-george-residents-said/.

[3] Declaration of Mitski Avalōx in Support of Mot. For Preliminary Inj. ¶¶ 3-4, 13-15 ("Avalōx Decl."); Michelle Tanner (@michelletannerusa), Instagram (June 3, 2022), https://www.instagram.com/p/CeWlnkaphwq/.

[4] Michelle Tanner (@michelletannerusa), Instagram (Nov. 6, 2022), https://www.instagram.com/p/Cko3_QNNST9; Pl.'s Prelim. Injun. Mot., Ex. D, We Are the People, *Taking Down Utah's Deep State Ft. Michelle Tanner*, (May 24, 2023), https://www.youtube.com/watch?v=-GeA5WO8J24.

[5] Avalōx Decl. ¶ 1.

[6] *Id.* ¶¶ 2, 13.

the art of drag, creating spaces for self-expression and fostering inclusivity and diversity.[7] Through their performances and public visibility, Drag Stars and its performers' existence is a form of political resistance to anti-LGBTQ+ laws and efforts.[8]

On March 3, 2023, Avalōx formally applied for a permit to hold an April 28 drag event, "Our Allies & Community Drag Show," in City-owned Vernon Worthen Park.[9] Earlier, on February 22, the City's Special Events Coordinator, Sarah Reber, confirmed that Drag Stars had "a hold on Vernon Worthen."[10]

On March 8, Reber circulated to City officials Plaintiffs' application and an application for a "Pride 2023" event, flagging them "due to the sensitive nature."[11] Just days later, on March 16, the Council approved Ordinance No. 2023-03-003, which imposed a six-month moratorium on the Council granting any new applications for special events permits (the "Moratorium").[12] The Council's stated reasons for approving the Moratorium were (1) to prevent the overuse of parks

---

[7] *Id.* ¶ 6-9.

[8] *Id.* ¶¶ 5-12.

[9] *Id.* ¶ 18.

[10] *Id.*

[11] Avalōx Decl. Ex. B at DSTARS000147.

[12] The full text of Ordinance No. 2023-03-003 and of other relevant ordinances and City Code provisions are included in this motion's appendix. Relevant here, Section 1 of Ordinance No. 2023-03-003 provides that "[t]he provisions of [the] City Code [allowing for special event permits] are hereby suspended and made inapplicable for [certain] Special Event requests and no application shall be processed which is inconsistent with this suspension." The provision applies to applications "for any new Special Event . . . which has not previously been held within the City of St. George excluding those events for which a completed application was received by the City by close of business March 15, 2023," and applications "for any recurring or repeat event . . . which was not held within the previous calendar year and is not on the list of reoccurring events provided to the City Council by City staff on September 2, 2022" or "for which there has been enforcement action taken or threatened." Section 4 provides that the Moratorium shall "be effective for a period of no greater than six (6) months."

and preserve the grass, and (2) to give the City time to review its ordinances relating to events.[13] The Moratorium would not apply to any applications submitted prior to its enactment.

On March 21, the City Manager met with Reber and other officials to discuss the pending applications, and the majority of the City Council's desire to enforce for the first time City Code § 3-10-4(C), which provides that "[n]o advertising of a special event shall be permitted until city approval of the special event is granted and a special event permit is issued" (with City Code § 3-10-3, the "Advertising Prohibition").[14] A City-employed high school intern reported that twelve of sixteen events with pending applications were "advertising" ahead of their permit approvals.[15] Drag Stars' planned event was one of them.[16] The intern attached two images related to the event, both from Drag Stars' March 30 post on a platform that enables event planners to solicit vendors. The graphic for Drag Stars' post was not designed to publicize the event to attendees; indeed, it stated that the event's location was "TBD."[17] The intern also submitted images from the eleven other event organizers who had posted "advertisements" prior to obtaining permits.

Meanwhile, between March 9 and March 16, Avalōx corresponded extensively with Reber about logistics for the event and was repeatedly assured that everything was on track.[18] On March 16, Avalōx asked Reber if she could begin advertising the event, and Reber orally agreed.[19] Relying on this assurance, Drag Stars held a photoshoot for a social media advertisement for the

---

[13] Pls' Prelim. Inj. Mot., Ex. A, Community Education Channel, *St. George City Council March 16, 2023*, YouTube (Mar. 16, 2023), https://www.youtube.com/watch?v=tLCmGvg61-g.
[14] Avalōx Decl. Ex. A at DSTARS000053.
[15] Avalōx Decl. Ex. B at DSTAR000093-97.
[16] Avalōx Decl. Ex. A. at DSTARS000057.
[17] *Id*.
[18] Avalōx Decl. ¶¶ 16-19.
[19] *Id*. ¶¶ 19-20.

5

event, which was posted on March 30.[20] Over the next few days, City officials received complaints from residents opposed to drag shows.[21]

On March 29, Drag Stars received an email seeking payment for reserving Vernon Worthen Park.[22] On March 31, Avalōx visited City Hall to discuss this with Reber, who again assured her that the City was considering her application.[23] That same day, "a majority of the City Council" instructed City staff to deny permits to event organizers who had violated the Advertising Prohibition.[24] An hour after speaking to Reber, Avalōx received a denial letter.[25]

On April 6, the City Council amended the Special Event chapter of the City Code through Ordinance No. 2023-04-001 (the "Reoccurring Event Ordinance"), exempting from the Advertising Prohibition a list of "reoccurring events and events for which the city is a sponsor." Specifically, the Reoccurring Event Ordinance added the following sentence to City Code § 3-10-4(C):

> "Events which are listed on the March 21, 2023, list of reoccurring events and events for which the city is a sponsor may promote and advertise the event after submission of a preliminary application, confirmation by city staff of the availability of the location and dates for the event, and payment of the application fee, if any."[26]

---

[20] *Id.* ¶ 21; Avalōx Decl. Ex. A at DSTARS000028.

[21] Avalōx Decl. ¶ 22; Avalōx Decl. Ex. B at DSTARS000062-69. These complaints stated, among other things, that most of the City Council had been "supported" in recent elections "because of [their] stance against" the LGBTQ+ community, and that the show was "an abominable stunt which has the deliberate intent to expose children to sexual perversion." *Id.*

[22] Avalōx Decl. ¶ 23.

[23] *Id.*

[24] Avalōx Decl. Ex. A at DSTARS000055. Plaintiffs are not aware of any previous instance of the City denying a special event permit based on a violation of the Advertising Prohibition. Indeed, the Advertising Prohibition is not referenced in the City Code's list of grounds for denying a special event permit.

[25] Avalōx Decl. ¶ 24.

[26] *Compare* Ordinance. No. 2015-10-003 *with* Ordinance No. 2023-04-001.  The referenced list of "reoccurring" and city-sponsored events does not appear to be publicly available.

6

The City retroactively applied the exemption to many events that had violated the Advertising Prohibition at the same time as Drag Stars, and the same list of events was also exempted from the Moratorium. The word "sponsor" is a circular misnomer—it is not defined in the City Code and simply means that the City has decided to approve the event, sometimes by waiving fees.[27] Thus, just as the City first enforced the Advertising Prohibition, it gave itself unbounded discretion to exempt any event it chose.

Drag Stars timely appealed the permit denial to the City Council on April 5.[28] At the April 11 hearing, Councilmember Dannielle Larkin raised concerns that the Advertising Prohibition was unclear as to whether communications like Drag Stars' post seeking vendors for an event without even specifying a St. George location were prohibited.[29] Larkin had previously expressed concerns that, because event permits are often not issued until the day before the event, the Advertising Prohibition was effectively a nearly-complete ban on advertising.[30] The Council nevertheless denied Drag Stars' appeal, with only Larkin voting to grant the permit.[31]

As a result of these actions, Plaintiffs are suffering the ongoing harm of not being able to exercise their right to free speech. Plaintiffs are prohibited from holding their drag event, and Avalōx was and is currently being denied the right to perform drag herself in public spaces within St. George. Plaintiffs will be unable to hold public drag performances, like the one they planned

---

[27] See City Code 3-2-10 (defining city event). City Code 3-2-10 defines a city event as "a special event that is organized and operated by the city, whether directly or by contract with a third party operator." The code also notes, "For purposes of this chapter, events organized and conducted by the city located on city-owned property or within city facilities are not special events; however, events held by non-city entities which may have some level of sponsorship by the city are special events." City Code 3-2-10(D).

[28] Avalōx Decl. Ex. A at DSTARS000042.

[29] Pls.' Prelim. Inj. Mot., Ex. C, Community Education Channel, *St. George City Council April 11, 2023*, YouTube (Apr. 11, 2023), https://www.youtube.com/watch?v=xO19HtFWqGw.

[30] Pls.' Prelim. Inj. Mot., Ex. B, Community Education Channel, *St. George City Council April 6, 2023*, at 35:000 YouTube (Apr. 6, 2023) https://www.youtube.com/watch?v=XKJiLOTQj5A.

[31] Avalōx Decl. ¶¶ 31-32.

for April, in St. George, for at least another six months. By denying them a permit to perform in public spaces, the City of St. George is ensuring that Drag Stars' message—that LGBTQ+ and gender diverse individuals are welcome and belong in rural areas—is silenced and may only be expressed behind closed doors. These abridgements of Plaintiffs' First Amendment rights are unconscionable and warrant the Court's immediate intervention.

## ARGUMENT

A party is entitled to a preliminary injunction if it can demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest."[32] If Plaintiffs make an especially strong showing on the second, third, and fourth factors, a relaxed standard applies to the likelihood-of-success factor, and an injunction is warranted as long as "questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."[33] This Court should apply this relaxed standard because the requested relief is not one that alters the status quo, mandatory, or one that would afford Plaintiffs all the relief that they could recover at the conclusion of a full trial on the merits.[34] In any event, whether

---

[32] *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016)

[33] *Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006)

[34] *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) (*en banc*), *aff'd sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). Plaintiffs' requested relief would restore the status quo, meaning "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005). The last uncontested status between the parties was the period before the Advertising Prohibition had been used against Plaintiffs in a pretextual manner. This is also not a mandatory injunction, as Plaintiffs are seeking that the City's discriminatory behavior be enjoined. Finally, this requested relief is also not the full relief Plaintiffs could receive after a full trial on the merits, as Plaintiffs also seek permanent injunctions enjoining future unconstitutional denials of permits for drag performances, the

the Court applies the relaxed or the heightened standard, all factors strongly weigh in favor of a preliminary injunction here.

# I. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR FREE SPEECH CLAIMS

To establish a substantial likelihood of success, Plaintiffs must "show a reasonable probability that [they] will ultimately be entitled to the relief sought,"[35] but not "a certainty of winning."[36]

## A. Drag Performances Are Speech Protected Under the First Amendment.

Plaintiffs' planned live performance—a drag show—is protected by the First Amendment.[37] Although drag, like theater, "usually is the acting out—or singing out—of the written word, and frequently mixes speech with live action or conduct . . . that is no reason to hold [it] subject to a drastically different standard" from other protected mediums of expression.[38]

Drag is widely understood to contain a political message, and there is a long history of using drag for protest and advocacy. Drag inverts and challenges societal gender norms, which even today has a strong political valence.[39] Drag performances involve pure speech alongside other

---

Advertising Prohibition, and the Moratorium, as well as compensatory relief. For these reasons, Plaintiffs are entitled to the relaxed standard. In the alternative, Plaintiffs would also prevail under the higher standard. *See Evans v. Utah*, 21 F. Supp. 3d 1192, 1201 (D. Utah 2014) (finding that requested injunction of non-enforcement of same-sex marriage ban was prohibitory, not mandatory, and therefore was not subject to heightened likelihood-of-success standard).

[35] *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020) (internal quotation marks omitted).

[36] *Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transp.*, 843 F.3d 886, 901 (10th Cir. 2016).

[37] *See Norma Kristie, Inc. v. City of Okla. City*, 572 F. Supp. 88, 91 (W.D. Okla. 1983) (holding drag shows are protected First Amendment expression); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) ("[L]ive entertainment, such as musical and dramatic works fall within the First Amendment guarantee.").

[38] *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975).

[39] Leila J., Rupp et al., *Drag Queens and Drag Kings: The Difference Gender Makes*, 13 Sexualities 275 (2010); Jennifer Hilbert, *The Politics of Drag*, *in Out in Culture* (Corey K. Creekmur & Alexander Doty eds., 1995).

kinds of protected, expressive conduct. For example, drag performers use hair and dress to communicate messages about gender stereotypes, gender roles, and LGBTQ+ identity and community.[40] Plaintiffs' political and social message is "Rebelling by Existing," reflecting drag's counter-culture messaging. Through drag performances, Plaintiffs aim to foster inclusivity, empowerment, self-expression, and belonging for the LGBTQ+ community in rural areas. This kind of political speech is where First Amendment protection "is at its zenith."[41]

### B. The City Impermissibly Discriminated Against Plaintiffs Based On Their Viewpoint and the Content Of Their Speech in a Traditional Public Forum.

"[G]overnment . . . has no power to restrict expression because of its message, its ideas, its subject matter, or its content" unless it satisfies strict scrutiny.[42] Similarly, "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference."[43] Viewpoint discrimination is a particularly "egregious form" of content discrimination.[44] It occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject."[45] Courts have recognized that even laws that are content- or viewpoint-neutral on their face can be enforced in a discriminatory manner.[46] "For the state to

---

[40] *See Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511 (S.D. Tex. 2020) (hairstyle is protected speech if it communicates message about religion or heritage); *Doe ex rel. Doe v. Yunits*, No. 001060A, 2000 WL 33162199, at *3–4 (Mass. Super. Ct. Oct. 11, 2000*), aff'd sub nom. Doe v. Brockton Sch. Comm.*, No. 2000-J-638, 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000) (dressing in clothing associated with a gender is expression of identification with that gender).
[41] *See Meyer v. Grant*, 486 U.S. 414, 414 (1988).
[42] *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (internal quotation marks omitted); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid.").
[43] *Reed*, 576 U.S. at 170.
[44] *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).
[45] *Id*.
[46] *See Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011) (holding that facially valid ordinance could not constitutionally be enforced in content-discriminatory manner); *see also Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325 (2002) (explaining that pattern of denying waivers to disfavored speakers under otherwise valid statute "would of course be unconstitutional").

10

enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."[47]

Further, the City ordinances at issue here regulate speech in public parks, traditional public forums that receive special First Amendment protections.[48] "Traditional public fora . . . have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." [49] There, the government's right "to limit expressive activity [is] sharply circumscribed."[50]

### 1. The City's denial of Plaintiffs' permit application fails strict scrutiny.

The City engaged in impermissible content- and viewpoint-based discrimination by denying Plaintiffs' permit application based on the Advertising Prohibition, an ordinance that had been seldomly (if ever) enforced, while exempting other applications that had engaged in similar behavior. Even assuming the Advertising Prohibition is facially content- and viewpoint-neutral, strict scrutiny applies if it was enforced in a discriminatory manner.[51]

> (a) The denial of Plaintiffs' permit was content- and viewpoint-based discrimination.

The City's selective enforcement of the Advertising Prohibition to deny Plaintiffs' permit is a pretext for content and viewpoint discrimination against drag performance and LGBTQ+ rights.

---

[47] *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).
[48] *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).
[49] *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1219 (10th Cir. 2021) (internal quotation marks omitted).
[50] *Perry Educ. Ass'n*, 460 U.S. at 45. In a traditional public forum, the government must prove either that (1) the regulation is content-neutral, narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication (*i.e.* intermediate scrutiny) or (2) if the regulation is content-based, that it is narrowly tailored to serve a compelling government interest (*i.e.* strict scrutiny). *Id.*
[51] *See Hoye*, 653 F.3d at 854; *see also Thomas*, 534 U.S. at 325.

A court may find that impermissible discrimination existed in enforcing a seemingly content-neutral regulation based on, *inter alia*: (1) "statements by government officials on the reasons for an action," (2) "where the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted", or (3) "where the viewpoint-neutral ground is not actually served very well by the specific governmental action at issue; where, in other words, the fit between means and ends is loose or nonexistent."[52]

Evidence shows that all three occurred here, demonstrating that the motivating factor in the denial of Plaintiff's permit was the City's distaste for drag performances. *First*, some councilmembers, particularly Councilmember Tanner, have a history of mobilizing against drag performances.[53] A sustained local anti-drag campaign continues to pressure the City Council to eliminate drag from public spheres.[54] *Second*, throughout the bureaucratic process, Plaintiffs' application, and another application (for "Pride 2023"), were not treated similarly to other permit applications and were singled out during the review process as "particularly sensitive," even though the City's Special Events Review Committee found no issues with them and did not subject other applications to similar scrutiny.[55] Further, the City only denied three permits out of the

---

[52] *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004).
[53] This is evidenced by Councilmembers' attempts to revoke the permit to film the *We're Here* drag performance and subsequent efforts to oust the City Manager that refused to adhere to their unconstitutional request resulting in a $625,000 settlement. *See* Bryan Schott & Mark Eddington, *St. George city manager resigned after pressure over drag show on public property. He is leaving with a six-figure settlement.*, Salt Lake Trib. (Oct. 25, 2022), https://www.sltrib.com/news/politics/2022/10/25/st-george-city-manager-resigned.
[54] *See Morris v. City of New Orleans*, 399 F. Supp. 3d 624, 640 n.9 (E.D. La. 2019) (finding suspect under the First Amendment a permit system in which the City only initiated enforcement actions against murals that had public complaints against them).
[55] *See Satanic Temple, Inc. v. Saucon Valley Sch. Dist.*, No. 23-CV-01244, 2023 WL 3182934, at *12 (E.D. Pa. May 1, 2023) (school district violated First Amendment by inconsistently applying advertising prohibition to deny community group access to public while exempting other groups with similar advertisements); Avalōx Decl. Ex. B at DSTARS000147, DSTARS000101-110.

twelve pending applications alleged to have breached the Advertising Prohibition.[56] *Third*, the only offending "advertisement" ever cited against Plaintiff was in fact a solicitation to potential vendors which listed the event location as "TBD."[57] The City's actions against Plaintiffs' solicitation of vendors has no nexus to any City interest related to event advertising.

Additionally, last-minute changes in policy that break from past practice support a finding of pretext. In *Mesa v. White*,[58] the Tenth Circuit held that a County Commission violated the First Amendment by barring a member of the public from speaking at a public meeting based on the speaker's failure to satisfy a requirement that an agenda item "must be stated with sufficient specificity."[59] The court noted previous instances where that requirement had not been enforced, and explained that the Commission's stated reasons "were of such recent vintage . . . and such a break with past traditions" that they were likely pretexts for viewpoint discrimination.[60] The same reasoning applies here to the City's sudden decision to enforce the Advertising Prohibition against Plaintiffs.

The City does not appear to have ever previously enforced the Advertising Prohibition to deny a special event permit. These facts are unsurprising since the City often issued permits the day before the event itself, making the Advertising Prohibition almost impossible to comply with.[61] The City decided suddenly and without precedent to apply the Advertising Prohibition at exactly the time Plaintiffs' application was under consideration—despite at least one Councilmember's

---

[56] Pls' Prelim. Inj. Mot. Ex. C, Community Education Channel, *St. George City Council April 11, 2023*, YouTube (Apr. 11, 2023), https://www.youtube.com/watch?v=xO19HtFWqGw.
[57] Avalōx Decl. Ex. A at DSTARS000059.
[58] 197 F.3d 1041 (10th Cir. 1999).
[59] *Id*. at 1043.
[60] *Id.* at 1048.
[61] Pls.' Prelim. Inj. Mot., Ex. B, Community Education Channel, *St. George City Council April 6, 2023*, at 35:000 YouTube (Apr. 6, 2023), https://www.youtube.com/watch?v=XKJiLOTQj5A.

concern that the prohibition was unworkable.[62] Tellingly, the City immediately amended the Advertising Prohibition to exempt any event "sponsored" by the City, and interpreted that exemption to mean that any event the City decided to approve in its unfettered discretion. As a result, only three of the twelve applicants who were arguably in violation of the Advertising Prohibition were denied permits.

In sum, the record establishes that anti-drag animus was the reason Plaintiffs' application was denied and that the Advertising Prohibition was merely a pretext to mask that impermissible motivation. Overwhelming record evidence supports a finding that the City's denial of the permit based on the Advertising Prohibition was a pretext for content and viewpoint discrimination. Accordingly, the permit denial must meet strict scrutiny in order to pass constitutional muster.

*(b) The City fails to identify a compelling interest.*

The City cannot assert a coherent, let alone compelling, interest in selectively enforcing the Advertising Prohibition. At the April 6 City Council meeting, one Councilmember raised the concern that applicants could spend money on advertising and then complain to the City if their permit was denied.[63] Even assuming that preventing such complaints is a compelling interest, there is no evidence that an unsuccessful permit applicant ever invoked advertising expenditures to pressure the City to reverse its denial.

Moreover, the context of anti-drag and anti-LGBTQ+ statements by Councilmembers and the decision to grant exemptions undermine any argument that legitimate compelling interests underlie the Advertising Prohibition. Some Councilmembers expressed a personal disdain for drag performance in public, a prejudiced view shared by some of their constituents who sought to have

---

[62] *Id.*
[63] *Id.*

Plaintiffs' event canceled.[64] Catering to private biases is not a compelling, or even legitimate, interest.[65] Similarly, Plaintiffs' event was designed to be family-friendly, and the City had no compelling interest in protecting minors from adult content.

> (c) *The denial of the permit is not narrowly tailored to, or the least restrictive means of, furthering a compelling interest.*

Even assuming a compelling interest existed, the permit denial did not narrowly further that interest.[66] Any of the City's purported interests could be satisfied without a wholesale ban on speech, including by requiring pre-permit advertisements to prominently state that the event remains subject to City approval. An argument that denying Plaintiffs' permit somehow protects children is similarly unavailing, as Plaintiffs' event easily meets any community standards that already are and could be imposed on public, family-friendly events to make sure that content is age-appropriate.

Further, even if catering to anti-drag biases was a compelling interest (it is not), the Advertising Prohibition fails to further that interest because it does not ban drag events, only those that advertise before a permit is issued.

### 2. The City's six-month moratorium is also unconstitutional.

To the extent the City argues that its six-month moratorium on special events justifies continuing to deny Plaintiffs' permit, that rationale also fails constitutional scrutiny. A neutrally written ordinance might still be deemed content-based discrimination if "adopted . . . because the [government] disagreed with a message being conveyed."[67]

> (a) *The Moratorium is content- and viewpoint-based discrimination.*

---

[64] Avalōx Decl. Ex. B at DSTARS000062-66.
[65] *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." (internal quotation marks omitted)).
[66] *Holt v. Hobbs*, 574 U.S. 352, 364 (2015).
[67] *Harmon*, 981 F.3d at 1148.

The Moratorium is subject to strict scrutiny because it is content- and viewpoint-based on its face. The Moratorium expressly exempts any events identified as "city-sponsored" (i.e., events the City decides to approve in its complete discretion). "Speech restrictions based on the identity of the speaker are all too often simply a means to control content."[68] Moreover, where First Amendment protections are involved, "authority to grant an exemption on a 'case-by-case' basis is precisely the sort of discretionary process that the Supreme Court has condemned."[69] Here, the exemption for "city sponsored" events gives the City complete freedom to allow its preferred speech to be heard while banning disfavored speech. The City cannot justify barring Plaintiffs' event as an even-handed application of a policy, when that "policy" consists of the City simply picking and choosing which speech it prefers.

Further, the Moratorium itself is a pretext for impermissible discrimination intended to bar drag performances. The timing of the Moratorium and the exemption of City-approved events suggest that the Moratorium was instituted to prevent drag events from taking place in St. George. The Moratorium is thus unconstitutional unless it satisfies strict scrutiny.

> *(b) The City does not have a compelling interest in enacting the Moratorium.*

Neither of the City's two articulated justifications for enacting the Moratorium—(1) the parks' grass needs time to recover and (2) the City needs time to review the ordinances related to events—rises to the level of "compelling" interest.[70] Any argument to the contrary is undermined

---

[68] *Reed*, 576 U.S. at 170; *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) ("*Buckley* thus stands for the proposition that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.").

[69] *Ass'n of Cmty. Orgs. for Reform Now, (ACORN) v. Mun. of Golden*,744 F.2d 739, 749 (10th Cir. 1984) (citing *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 964 n.12 (1984)).

[70] Pls.' Prelim. Inj. Mot., Ex. A, Community Education Channel, *St. George City Council March 16, 2023*, YouTube (Mar. 16, 2023), https://www.youtube.com/watch?v=tLCmGvg61-g

by the City's exemption of its own cherry-picked list of events from the Moratorium. These events will presumably lead to similar wear-and-tear to the parks' grass and other facilities. And the City's review process can take place while these events move forward.

> (c) *The City's Moratorium is not narrowly tailored to, or the least restrictive means of, furthering a compelling interest.*

Even assuming *arguendo* the City has a compelling interest in its selective Moratorium, that Moratorium fails to satisfy narrow tailoring. Rather than adopt the *least restrictive means*, the City did the opposite—it shut off all access to special events permits except for events where the City has granted an exemption. There were alternatives such as limiting events to specific sections of grass, making non-grassy parts of parks available, or scheduling events such that specific sections of the park remained untouched to allow grass in that section to recover. Further, the Moratorium is underinclusive because, like the Advertising Prohibition, it exempts the events on the City's approved list.

### C. The Denial of Plaintiffs' Permit and Moratorium Also Fail Intermediate Scrutiny.

Even if the City's actions were content-neutral, they fail intermediate scrutiny because those actions were not narrowly tailored to achieve a significant governmental interest and did not leave "open ample alternative channels for communication of the information."[71] "The failure to satisfy any single prong of this test invalidates" the restriction.[72] To satisfy narrow tailoring, a prohibition must not "burden substantially more speech than is necessary to further the government's legitimate interests."[73] This requirement not only "guard[s] against an[y] impermissible desire to censor," but, more significantly, "prevents the government from too readily

---

[71] *Brewer*, 18 F.4th at 1222.

[72] *Grossman v. City of Portland*, 33 F.3d 1200, 1205 (9th Cir. 1994).

[73] *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).

'sacrific[ing] speech for efficiency'" by "demanding a close fit between ends and means."[74] "[T]he government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier."[75] The City's denial of Plaintiffs' permit and six-month moratorium fails on all counts.

For the same reasons that the application of the Advertising Prohibition to Plaintiffs' permit application fails strict scrutiny, as discussed *supra* Sections I(B)(1)(b) and (c), the City cannot satisfy intermediate scrutiny. It has no significant interest in selectively enforcing the Advertising Prohibition, which is also not narrowly tailored to any significant interest. Further, the Advertising Prohibition does not leave open any channels of communication, let alone ample ones. Examples of regulations that satisfy this test have included "an ordinance [that] allowed picketing in neighborhoods, but barred protesters from picketing a single residence," or a "government restriction [that] only imposed an eight-foot distance between demonstrators and their audience."[76] The Advertising Prohibition, in contrast, is an *outright ban* that bars organizers from making potential attendees aware of their event or even (based on the City's actions against Plaintiffs) from soliciting potential vendors. Combined with the City's routine delay in issuing permits, the Advertising Prohibition completely closes off almost all channels of communication for publicizing an event.

To the extent the City seeks to rely on the Moratorium, that policy fails intermediate scrutiny for the same reasons that it fails strict scrutiny. *See supra* Sections I(B)(2)(b) and (c). Further, the Moratorium offers no ample alternatives for communication in traditional public fora because it bans all disfavored events from public parks.

---

[74] *Brewer*, 18 F.4th at 1221-22.
[75] *Id*. at 1216.
[76] *McCraw v. City of Okla. City*, 973 F.3d 1057, 1078 (10th Cir. 2020).

**D.  The Licensing Scheme and Permit Denial Are Impermissible Prior Restraints.**

Collectively and individually, the City's permit denial and Moratorium violated Plaintiffs' First Amendment rights for the independent reason that they operated as unconstitutional prior restraints. As explained in *Freedman v. State of Maryland*, any system of prior restraint of expression "bear[s] a heavy presumption against its constitutional validity."[77] An ordinance that imposes a permit requirement for engaging in communicative conduct must include clear guidelines cabining the government's permitting decision.[78] The ordinance must also ensure that a decision will be made "within a specified brief period."[79] Prior restraint in the form of a licensing scheme abridges free speech when it gives government officials unfettered discretion to grant or deny permission.[80] Defendants' denial of Plaintiffs' special event application and imposition of a six-month Moratorium, against the backdrop of the countermobilization against drag over the last year, are impermissible prior restraints.

1.  **The Permitting Scheme does not satisfy the requirements for a licensing scheme for expressive activities and simply operates to block Plaintiffs' protected speech.**

The City's permitting scheme, including the Advertising Prohibition and the Moratorium, on its face and as applied to bar Plaintiffs' event, fails both parts of the *Freedman* test: it provides officials with excessive discretion to deny permits and does not guard against undue delay in permitting decisions.

*(a) The Permitting scheme provides officials with excessive discretion to deny permits.*

---

[77] 380 U.S. 51, 57 (1965).
[78] *Id.*
[79] *Id.* at 59.
[80] *ACORN v. City of Tulsa*, 835 F.2d 735, 740 (10th Cir. 1987).

*First*, the City has interpreted the permitting ordinance as allowing the City to deny permits when an applicant has not complied with the Advertising Prohibition. But as explained above, the City has unfettered discretion to exempt events from the Advertising Prohibition by adding them onto the list of "city sponsored" events. Further, because special event permits typically issue no earlier than a day before the date of the event, for non-exempt events, the Advertising Prohibition effectively makes it impossible to publicize the event, at risk of putting the applicant's permit approval in jeopardy. At least one Councilmember expressed that very concern. Plaintiffs themselves were put in this impossible position and sought Reber's verbal permission to advertise so their drag show could move forward. *Second*, as discussed *supra* Section I(B)(2)(a), the Moratorium and its exemption of a curated list of favored events allow the City unbridled discretion to control which events take place during six entire months.

Taken together, these policies effectively give the City complete discretion in permitting decisions. When the Moratorium is not in effect, the City may give preference to favored events by adding them to the list of "city sponsored" events for purposes of the Advertising Prohibition. For disfavored events, the City can withhold approval until the last minute, forcing applicants to make the impossible choice of either moving forward with an event they have been unable to publicize, or advertising the event and giving the City an excuse to deny the permit. While the Moratorium is in effect, the City can simply add events with which it agrees to the list of exempt "sponsored" events while refusing to do so for events with which it disagrees, effectively barring such events until the Moratorium has ended. This is all the more egregious with respect to City parks, as the Moratorium is a total ban on speech in a public forum for any speakers not on the City's list of preferred events. By instituting a blanket ban on events in a public forum while exempting events the City has arbitrarily designated as "city sponsored," the City has granted itself

excessive discretion in permitting decisions. The First Amendment bars permitting schemes that leave government officials this level of discretion.[81]

*(b) The permitting scheme does not guard against undue delay.*

With respect to delay, "[t]he core policy underlying *Freedman* is that the license for a First Amendment-protected business must be issued within a *reasonable period of time,* because *undue* delay results in the unconstitutional suppression of protected speech."[82] The permitting scheme fails to satisfy this prong. The permitting ordinance sets no timeline for the City Council to approve or deny a permit. And indeed, the record indicates that permits typically do not issue until the last minute. Likewise, the Moratorium fails to satisfy this element. As noted above, even licensing schemes must be subject to reasonable time limits, at "risk of indefinitely suppressing permissible speech."[83] Six months is neither brief nor reasonable. The lack of protections against undue delay is another reason the permitting scheme is invalid.

**2.    The Advertising Prohibition is itself an impermissible prior restraint on commercial speech.**

Separately, the City's Advertising Prohibition is itself invalid. Because Plaintiffs' purported violation of this prohibition was the City's ostensible basis to deny Plaintiffs' application, that denial rests on an unconstitutional basis and cannot stand.

The Advertising Prohibition is, at a minimum, a total bar on the exercise of commercial speech for applicants that have not yet received a permit and have not been added to the list of favored "city sponsored" events. This proscription violates the First Amendment unless the City

---

[81] *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992) (striking down parade permit ordinance requiring marchers to pay unspecified government-determined fees); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769–72 (1988) (striking down an ordinance giving the mayor authority to impose "terms and conditions deemed necessary and reasonable" in issuing permits for newspaper boxes).

[82] *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 228 (1990) (plurality opinion) (emphasis added).

[83] *Id.* at 227.

can demonstrate that: (1) "the State's interests in proscribing [the speech at issue] are substantial," (2) "the challenged regulation advances these interests in a direct and material way," and (3) "the extent of the restriction on protected speech is in reasonable proportion to the interests served."[84] The City cannot meet that burden.

On the first prong, as explained above, the City cannot claim any "substantial" interest in enforcing the Advertising Prohibition, which regularly went unenforced until this year. On the second prong, the government's "burden is not satisfied by mere speculation or conjecture; rather, a governmental body . . . must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."[85] There is no evidence, however, that the City has ever undertaken this analysis. As explained in further detail above, *see* Section I(B)(1)(b), there is no evidence that the harms the Advertising Prohibition is purportedly intended to prevent have ever occurred, despite years of non-enforcement. Further, the purported interest in deflecting complaints from unsuccessful applicants would support a rule barring applicants from spending *any* money before their permit issues; the City's rule covers advertising expenses only and thus does not directly or materially advance that interest.

As to the third prong, a "regulation is unconstitutional 'if the governmental interest could be served as well by a more limited restriction on commercial speech.'"[86] That is plainly the case here. As explained above, *see supra* Section I(B)(1)(c), the prohibition is overbroad because there are many alternatives available other than a wholesale ban on advertising, such as requiring advertisements to state that a permit application remains pending.

---

[84] *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 987–88 (10th Cir. 2020) (quoting *Edenfield v. Fane*, 507 U.S. 761, 767 (1993)).

[85] *Edenfield*, 507 U.S. at 770–71; *accord Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1071 (10th Cir. 2001).

[86] *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1231-32 (10th Cir. 2005) (quoting *Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980)).

### E.  The Advertising Prohibition And Moratorium Are Unconstitutionally Overbroad.

A law is unconstitutionally overbroad on its face "if it prohibits a substantial amount of protected speech."[87] "The crucial question, then, is whether the ordinance sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments."[88] A statute is facially overbroad if its "overbreadth [is] *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."[89]

The City's permitting scheme fails this test. Since permits for special events do not typically issue until a day before or the day of a special event, the Advertising Prohibition effectively functions as a near-total ban on protected speech by (1) making it impossible for event organizers to attract an audience or other speakers, and (2) by prohibiting almost all commercial speech creating interest in a special event. The First Amendment necessarily protects the right for individuals to engage in protected speech together and for such speech to be heard by an audience.[90] The Advertising Prohibition completely curtails these rights in St. George's traditional public fora, as discussed *supra* Sections I(D)(1)(a) and I(D)(2). The Advertising Prohibition plainly reaches too much constitutionally protected speech and is overbroad.

Similarly, the Moratorium is also unconstitutionally overbroad. As explained above, *see* Section I(B)(2)(c), it sweeps in substantially more speech than necessary to achieve the City's

---

[87] *United States. v. Williams*, 553 U.S. 285, 292 (2008).
[88] *Grayned v. City of Rockford*, 408 U.S. 104, 114–15 (1972).
[89] *Williams*, 553 U.S. at 292 (emphasis in original) (citations omitted).
[90] *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas."); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both.").

stated goals. A sweeping six-month categorical ban on special events in *any* public fora clearly reaches far too much constitutionally protected speech than can be allowed.

### F.  The Advertising Prohibition And Moratorium Are Unconstitutionally Vague.

A law is unconstitutionally vague on its face if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or it "authorizes or even encourages arbitrary and discriminatory enforcement."[91] Even when a statute does not reach a "substantial" amount of protected speech, it may still "be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests."[92] A law must provide sufficient guidance to ward against its "potential for arbitrarily suppressing First Amendment liberties."[93] "[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms."[94]

The Advertising Prohibition both fails to provide notice of what conduct it prohibits and allows for arbitrary and discriminatory enforcement. It does not define the "advertising" within its scope and thus encourages discriminatory enforcement. The single "advertisement" cited against Plaintiffs was a post on a platform that facilitates vendor contracts and payments, and that listed the location of Plaintiffs' event as "TBD." It is unclear how or why a solicitation for vendors without specifying the event location—as opposed to a public-facing event announcement seeking to attract audience members—constitutes "advertisement." The City Council itself seems to be

---

[91] *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Friends of George's, Inc. v. Tennessee*, No. 23CV02163, 2023 WL 2755238, at *5-6  (W.D. Tenn. Mar. 31, 2023) (finding unconstitutionally overbroad and vague a statute criminalizing "adult cabaret entertainment" on public property or in a location where it could be viewed by a minor and granting a TRO enjoining the statute).
[92] *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999).
[93] *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).
[94] *Harmon*, 981 F.3d at 1151.

confused about what falls within the Advertising Prohibition, as one Councilmember questioned whether soliciting vendors actually constituted advertising. When even the governing body does not seem to understand what conduct is forbidden, the public itself will be left without guidance as to what speech is allowed, chilling constitutionally-protected speech. And the Advertising Prohibition has clearly allowed for arbitrary or discriminatory enforcement, as exhibited by the targeted enforcement of this provision against Plaintiffs based on the substance of their speech, as discussed *supra* Section I(B)(1)(a).

## II.  THE OTHER FACTORS SUPPORT A PRELIMINARY INJUNCTION.

### A.  Absent The Grant Of An Injunction, Plaintiffs Will Continue to Suffer Irreparable Harm.

Having established a likelihood of success on the merits, Plaintiffs will continue to suffer irreparable harm without injunctive relief. "[W]hat makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. Any deprivation of any constitutional right fits that bill."[95]

First, Plaintiffs face irreparable harms due to the violation of their First Amendment rights. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[96] "[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."[97]

---

[95] *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) (internal citation omitted); *see also Elrod*, 427 U.S. at 373(loss of First Amendment "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *ACLU of Ky. v. McCreary County*, 354 F.3d 438, 445 (6th Cir. 2003) (citing *Elrod* for the principle that "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated"), *aff'd*, 545 U.S. 844 (2005).2003).

[96] *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Utah Licensed Beverage*, 256 F.3d at 1076 (noting the presumption when infringement of First Amendment rights is alleged).

[97] *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)

Second, Plaintiffs have and will continue to suffer other types of irreparable harm. Plaintiffs wish to hold drag shows in public spaces in St. George. Yet, under the Moratorium, Drag Stars cannot even apply to do so for at least several more months. The City has essentially banned Plaintiffs from expressing themselves in public spaces by forcing them to seek alternative private venues where their political message can only be heard behind closed doors. "'[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'"[98]

Third, the Moratorium injures Plaintiffs' ability to reach their intended audience and carry out their political mission of "Rebelling by Existing." Specifically, the City, through its Moratorium, barred Plaintiffs from discussing and celebrating gender nonconformity and from providing a welcoming message and support network to other LGBTQ+ members of the community.[99] Indeed, the ongoing effect of the City's permit denial is to send the message to Plaintiffs and the LGBTQ+ community that they are not welcome, not worthy of recognition, and must remain in hiding.[100] Following the HBO taping, the City conveyed its disapproval of messages that welcome, support, and uplift the LGBTQ+ community in St. George.[101] Avalōx created Drag Stars as a direct response to the City's hostility, to remind the City that there is a strong LGBTQ+ community in St. George that deserves a place in public spaces.[102] Plaintiffs cannot carry out their political aims and reach their intended audiences if they are denied an opportunity to speak in a traditional public forum.

---

[98] *Se. Promotions, Ltd.*, 420 U.S. at 556 (quoting *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939)).
[99] Avalōx Decl. ¶¶ 32, 37-38.
[100] *See id.*
[101] *Id*. at ¶ 4.
[102] *Id*. at ¶¶ 5, 32, 37-38.

Fourth, Plaintiffs are barred from freely and publicly expressing their identities. Avalōx is being denied the opportunity to herself perform drag in public spaces within St. George. Without an injunction, Plaintiffs' ability to engage in protected expression in public spaces in St. George and share their message with their intended audiences will continue to suffer.

**B. The Injunction Is Not Adverse To The Public Interest And Plaintiffs' Injuries Outweigh Any Alleged Damage To Defendants.**

When the government opposes a preliminary injunction, the final two factors—the balance of equities and the public interest—merge.[103] "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."[104] Additionally, the record demonstrates that the serious, irreparable, and continuing injuries to Plaintiffs far outweigh any hypothetical harm to the public that might arise from enjoining the City's actions. Plaintiffs' planned drag performances risk no harm to anyone, as those who dislike drag have no obligation to attend. On the other hand, LGBTQ+ residents of Southern Utah and their allies will benefit greatly from the entertainment and community-building a large drag show facilitates. Finally, the public interest is served by preventing facially unconstitutional ordinances from taking effect—ordinances which would inhibit the First Amendment rights of Utahns.

**III. NO BOND SHOULD BE REQUIRED IF THE COURT ISSUES THE INJUNCTION.**

Finally, the Court should waive the requirement for Plaintiffs to post a bond.[105] Trial courts possess "wide discretion under Rule 65(c) in determining whether to require security."[106] Because

---

[103] *See Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

[104] *Awad*, 670 F.3d at 1132 (internal quotation marks omitted).

[105] *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction … only if the movant gives security *in an amount that the court considers proper* to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added)).

[106] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009).

a preliminary injunction "enforces fundamental constitutional rights against the government …

[w]aiving the security requirement best accomplishes the purposes of Rule 65(c)."[107]

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction.

Dated: May 30, 2023                    Respectfully submitted,

                                       By:

                                       /s/ Jeremy Creelan

| | |
|---|---|
| Valentina De Fex | Jeremy Creelan* |
| John Mejia | Rémi Jaffré* |
| **AMERICAN CIVIL LIBERTIES UNION** | Owen W. Keiter* |
| **OF UTAH FOUNDATION** | **JENNER & BLOCK LLP** |
| 311 South State Street, Suite 310 | 1155 Avenue of the Americas |
| Salt Lake City, Utah  84111 | New York, NY 10036 |
| (801) 521-9862 | (212) 891-1600 |
| vdefex@acluutah.org | JCreelan@jenner.com |
| jmejia@acluutah.org | RJaffre@jenner.com |
| | OKeiter@jenner.com |

Emerson Sykes*                         Nathaniel Castellano*
Joshua A. Block*                       **JENNER & BLOCK LLP**
Elizabeth Gyori*                       1099 New York Avenue, NW, Suite 900
**AMERICAN CIVIL LIBERTIES UNION**     Washington, DC 20001
**FOUNDATION**                         (202) 639-6000
125 Broad Street, Floor 18             NCastellano@jenner.com
New York, NY 10004
(212) 549-2500                         Meredith Hurley*
esykes@aclu.org                        Jocelyn Sitton*
jblock@aclu.org                        **JENNER & BLOCK LLP**
egyori@aclu.org                        353 N. Clark Street
                                       Chicago, IL 60654
*appearing pro hac vice*               (312) 222-9350
                                       MHurley@jenner.com
                                       JSitton@jenner.com

---

[107] *United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1260 (D. Utah 2017) (citing *RoDa Drilling Co.*, 552 F.3d at 1215) (subsequent citations omitted)).

**APPENDIX: RELEVANT PORTIONS OF ST. GEORGE CITY CODE**

**3-10-3: Permit Required**

No person, corporation, partnership, association or other entity, public or private, shall promote, advertise, or hold a special event without first obtaining a special event permit. Events which are listed on the March 21, 2023, list of reoccurring events and events for which the city is a sponsor may promote and advertise the event after submission of a preliminary application, confirmation by city staff of the availability of the location and dates for the event, and payment of the application fee, if any. (Ord. 2015-10-003, 10-1-2015; amd. Ord. 2023-04-001, 4-6-2023)

**3-10-4: Application Requirements and Procedures**

…

C. *Advertising:* No advertising of a special event shall be permitted until city approval of the special event is granted and a special event permit is issued. Events which are listed on the March 21, 2023, list of reoccurring events and events for which the city is a sponsor may promote and advertise the event after submission of a preliminary application, confirmation by city staff of the availability of the location and dates for the event, and payment of the application fee, if any. . . . ((Ord. 2015-10-003, 10-1-2015; amd. Ord. 2022-12-006, 12-15-2022; Ord. 2023-04-001, 4-6-2023)

**3-10-8: Grounds for Denial**

A.  *Grounds For Denial:* The special event application may be denied by the city if:

1.  The proposed special event violates a law, ordinance, policy, procedure, or regulation or poses a danger or threat to the public health, safety or welfare, or causes unreasonable inconvenience or cost to the public;
2.  The proposed special event is not consistent with the intended nature and use of the requested city property;
3.  The proposed special event is scheduled at a place and time that could disrupt or interfere with an already approved special event;
4.  The proposed location or building is not adequate to accommodate the proposed special event such as parking, sanitation facilities, and health or safety codes, or the nature of the proposed special event is such that the city, or the applicant does not have sufficient resources available to ensure the health, safety, and welfare of special event participants or the general public;
5.  The permit application contains a material falsehood or misrepresentation;
6.  The applicant has failed to pay a debt to the city including costs incurred during a prior special event;
7.  Incomplete permit applications; and
8.  The applicant or any person on whose behalf the application for a permit was made has on prior occasions:

   a.  Damaged city property, if the applicant is for an event on city property; or

   b.  Made material misrepresentations regarding the nature or scope of an event or activity previously permitted; or

   c.  Has violated the terms of prior permits issued to or on behalf of the applicant.

B.  *Notice:* If a special event permit application is denied, the city shall notify the applicant in writing of the reason or reasons for the denial. (Ord. 2015-10-003, 10-1-2015).

### Ordinance No. 2023-03-003: A TEMPORARY REGULATION SUSPENDING THE PERMITTING OR PROCESSING OF CERTAIN SPECIAL EVENT PERMITS UNDER TITLE 3, CHAPTER 10 OF THE CITY CODE.

**WHEREAS** Utah Code §10-3-702 grants to cities the legislative power to regulate and prohibit any activity, business, conduct, or condition authorized by the Utah Municipal Code which may be necessary to provide for the health, safety, and welfare of the community; and

**WHEREAS** under that legislative authority, the City has previously enacted an Ordinance governing the use of public facilities and permitting of special events at those facilities as found in Title 3, Chapter 10 of the City Code; and

**WHEREAS** the City of St. George ("City") has determined that the use of public facilities for special events has increased in recent years to the point that maintenance of the facilities is becoming more difficult; and

**WHEREAS** the City believes that the public facilities should be available to the public and should not be over encumbered by scheduled special events; and

**WHEREAS** the City also believes that special events are of benefit to the City and create a sense of community, promote economic development, and provide entertainment opportunities for the citizens; and

**WHEREAS** the City desires to balance the use of the facilities by the public with the demand for the facilities by special events; and

**WHEREAS** the City is seeking to understand the impacts to the community from the amount and types of use of its public facilities, including to residents surrounding the public facilities from the increased traffic, road closures, and noise; and

**WHEREAS** the City also is also seeking to understand the type and quantity of City resources expended for special events at its public facilities; and

**WHEREAS** in order to properly study the issues, this temporary suspension shall be applicable to events at City owned facilities and not events held at private venues; and

**WHEREAS** under the legislative authority granted by to the City, the City believes that a temporary suspension or moratorium on new special event applications is necessary in order to effectively create new provisions which will better balance the needs of the City, the public, and the events; and

**WHEREAS** consistent with temporary land use regulations under Utah Code §10-9a-504, this temporary regulation would be in effect for no longer than six months from the

effective date, thus allowing adequate time for the City to enact comprehensive regulations and standards regarding special events and the use of public facilities; and,

**WHEREAS** it is in the best interests of St. George City to provide for temporary prohibitions of new applications for special events while comprehensive regulations designed to protect the health, welfare and public safety within the City are being studied, publicly vetted and adopted;

**NOW, THEREFORE,** the City Council of the City of St. George, State of Utah, hereby ordains as follows:

Based upon the facts as set forth in the Preamble hereto, the City Council finds that there exists a compelling, countervailing public interest to enact the following temporary regulations:

**Section 1**      The provisions of City Code §3-10-1 through §3-10-10 are hereby suspended and made inapplicable for the following Special Event requests and no application shall be processed which is inconsistent with this suspension.

    1.1      An application for any new Special Event located on City owned property or

    within City facilities which has not previously been held within the City of St. George excluding those events for which a completed application was received by the City by close of business March 15, 2023;

    1.2      An application for any recurring or repeat event located on City owned property

    or within City facilities which was not held within the previous calendar year and is not on the list of reoccurring events provided to the City Council by City staff on September 2, 2022; and

    1.3      An application for any recurring or repeat event located on City owned property

    or within City facilities for which there has been enforcement action taken or threatened.

Section 2      Except as otherwise specified above, Reoccurring Events and Filming Permits as those terms are defined in City Code §3-10-2 shall not be subject to this ordinance.

Section 3      This permit suspension shall not be considered a "denial" of an event permit for which an appeal may be made.

Section **4**      The definition of Special Event as contained in §3-10-2 of the City Code is hereby amended as follows:

31

SPECIAL EVENT: A temporary event of any of the following or a combination of the following acts:

A. Any athletic event, entertainment event, parade, carnival, circus, dance, musical event, rodeo event, fighting event, racing event, live shows, fairs, concerts, block parties, filming event, or outdoor sales event, whether held for profit, nonprofit or charitable purposes held on private or public property within the city.

B. Any organized assemblage at any public park, public square or other city property which gathers for a common purpose or event under the direction and control of a person or entity and which uses more services, amusement devices such as stages, inflatable devices or temporary structures, or equipment, whether provided by the city or a third party, than normally provided to groups which reserve park facilities or other city-owned facilities.

C. Events held at the following are not special events under this chapter:

  1.  A building that has a business located in it that has a current annual business license as an event business;

  2.  A building with an assembly group classification under the International Building Code, as adopted by the city, so long as the event does not exceed the posted occupant load as approved by the city and has a current annual business license, if required.; and

  3.  A government owned facility.

D. For purposes of this chapter, city-events organized and conducted by the City located on City owned property or within City facilities are not special events; however, events held by non-city entities which may have some level of sponsored sponsorship by the city are special events.

Section 5    Effective Date. This Ordinance shall take effect immediately upon publication and/or posting as required by law and shall thereafter be effective for a period of no greater than six (6) months.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. The electronic case filing system sent a "Notice of E-Filing" to all e-filing counsels of record in this case.

/s/ Jeremy Creelan